## SEARS, ROEBUCK & CO. v. FEDERAL TRADE COMMISSION.

(Circuit Court of Appeals, Seventh Circuit.    April 29, 1919.)

No. 2659.

1. TRADE-MARKS AND TRADE-NAMES ⟂80½, New, vol. 8A Key-No. Series—UNFAIR COMPETITION.

A finding by the Federal Trade Commission that a mail-order house doing an interstate business was guilty of unfair competition in selling sugars, teas, and coffees under representations that it had obtained special price concessions, because of the magnitude of its purchases, and that it purchased selected brands from abroad, *held* warranted.

2. TRADE-MARKS AND TRADE-NAMES ⟂80½, New, vol. 8A Key-No. Series—PROCEEDINGS BEFORE FEDERAL TRADE COMMISSION—INJUNCTIONAL ORDER.

An order issued by the Federal Trade Commission, commanding a mail-order house doing an interstate business to cease and desist from certain unfair practices in connection with the sale of sugar and other staple commodities, *held* not to have been improvidently issued because the mail-order house had discontinued such methods, where it was contending that Act Sept. 26, 1914, § 5 (Comp. St. § 8836e), creating the Federal Trade Commission, was unconstitutional, or, if valid, had not been infringed, and the government's control of sugar sales and consumption had temporarily put an end to the objectionable practices in any event.

3. EVIDENCE ⟂23(1)—JUDICIAL NOTICE—GOVERNMENT CONTROL OF TRADE.

On petition to have a cease and desist order issued by the Federal Trade Commission vacated on the ground that the unfair practices of petitioner which related to sales of sugar, etc., had ceased, the court will take judicial notice of the government's control of the sale and consumption of sugar during the war, which temporarily at least put an end to the objectionable practice.

4. TRADE-MARKS AND TRADE-NAMES ⟂80½, New, vol. 8A Key-No. Series—UNFAIR COMPETITION—FEDERAL TRADE COMMISSION.

Act Sept. 26, 1914, § 5 (Comp. St. § 8836e), giving the Federal Trade Commission authority over unfair methods of competition, and declaring the same unlawful, is not void for indefiniteness because the words "unfair methods of competition" were not defined; the trader being entitled to his day in court, where common-law principles would control.

5. CONSTITUTIONAL LAW ⟂62, 80(2)—UNLAWFUL DELEGATION OF LEGISLATIVE AND JUDICIAL POWER.

Act Sept. 26, 1914, § 5 (Comp. St. § 8836e), giving the Federal Trade Commission power to stop unfair methods of competition in commerce and declaring the same unlawful, is not an unlawful delegation of legislative and judicial power; Congress having by the act declared the public policy applicable to the situation.

6. TRADE-MARKS AND TRADE-NAMES ⟂80½, New, vol. 8A Key-No. Series—POWERS OF FEDERAL TRADE COMMISSION—UNFAIR COMPETITION.

The Federal Trade Commission, under its authority to stop unfair methods of competition, cannot prevent a trader from selling a staple article as sugar below cost, although it may prevent such sales accompanied by representations which would injure other traders.

Alschuler, Circuit Judge, dissenting in part.

Original Petition to Review Order of Federal Trade Commission.

Original petition by Sears, Roebuck & Co. against the Federal Trade Commission, to review an order commanding petitioner to desist from certain unfair methods of competition in commerce.    Commission directed to modify its orders, and petition in other respects denied.

⟂For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Sidney Adler, of Chicago, Ill., for petitioner.
John Walsh, of Washington, D. C., for respondent.

Before BAKER and ALSCHULER, Circuit Judges, and CARPENTER, District Judge.

BAKER, Circuit Judge.   This is an original petition to review an order entered by the respondent, the Federal Trade Commission, against the petitioner, Sears, Roebuck & Co., a corporation, commanding the petitioner to desist from certain unfair methods of competition in commerce.  Respondent's order was based on its complaint, filed on February 26, 1918, on the petitioner's answer, and on a written stipulation of facts.  Procedure before the commission and also before this court on review is prescribed in section 5 of the act to create a Federal Trade Commission, approved on September 26, 1914 (38 Stat. 719, c. 311 [Comp. St. § 8836e]).  Respondent's authority over the subject-matter of its order is derived from the following provision in the same section: "Unfair methods of competition in commerce are hereby declared unlawful."   Section 4 (Comp. St. § 8836d) is a dictionary of terms used in the act.  "Commerce" means interstate or foreign commerce; but the general term, "unfair methods of competition," is nowhere defined specifically, nor is there a schedule of methods that shall be deemed unfair.

In its complaint respondent averred that petitioner is engaged in interstate and foreign commerce, conducting a "mail-order" business; that petitioner for more than two years last past has practiced unfair methods of competition in commerce by false and misleading advertisements and acts, designed to injure and discredit its competitors and to deceive the general public, in the following ways:

(1) By advertising that petitioner, because of large purchases of sugar and quick disposal of stock, is able to sell sugar at a price lower than others offering sugar for sale;

(2) By advertising that petitioner is selling its sugar at a price much lower than that of its competitors and thereby imputing to its competitors the purpose of charging more than a fair price for their sugar;

(3) By selling certain of its merchandise at less than cost on the condition that the customer simultaneously purchase other merchandise at prices which give petitioner a profit on the transaction, without letting the customer know the facts;

(4) By advertising that the quality of merchandise sold by its competitors is inferior to that of similar merchandise sold by petitioner, and that petitioner buys certain of its merchandise in markets not accessible to its competitors, and is therefore able to give better advantages in quality and price than those offered by its competitors.

Petitioner extensively circulated the following advertisements, among others:

"We can afford to give this guarantee of a 'less than wholesale price' because we are among the largest distributors of sugar wholesale or retail in the world.  We sell every year thirty-five million pounds of sugar.  And, buying

in such vast quantities, and buying directly from the refineries, we naturally get our sugar for less money than other dealers."

"For instance, every grocer carries granulated sugar in stock, but does he tell you which kind? There are two kinds—granulated cane sugar and granulated beet sugar—and they look exactly alike. Some people prefer the one and some the other. But beet sugar usually costs less than cane sugar, so if you are getting beet sugar you should pay less for it. Do you know which kind you are getting and which you are paying for?

"Our teas have a pronounced, yet delicate, tea flavor with an appealing fragrance because we spare neither time nor expense to get the very best the greatest tea gardens of the world can produce.

"First, because of the difficulty of getting in this country the exact character and flavor of certain teas, we do our own importing and critically test every tea. Our representative goes to the various tea-growing countries and makes the selection in person. Then, the greatest care is taken to get only first-crop pickings from upland soil.

"Also, by buying direct from the tea gardens, while the crops are being harvested, we are able to have them always perfectly fresh.

"It would be natural for you to conclude that all this care in buying and selecting would make our teas very high in price, but in reality, our prices are unusually low for such high quality. Here is a reason: By buying direct from the tea gardens we cut out the middleman's profit."

"Over land and sea, from the greatest coffee regions in the world we bring you the choicest of the crop, and make it possible for you to have that fresh, savory, and fragrantly tempting cup of coffee for your breakfast. You see, we buy direct from the best plantations in the world. We get the pick of the crop—upland coffees from rich, healthy soil and growers of unquestioned experience and skill. We buy enormous quantities and pay cash, thus making it possible to offer our customers the very best coffees at very low prices."

[1] Petitioner's sales of sugar during the second half of 1915 amounted to $780,000 on which it lost $196,000. Petitioner used sugar as a "leader" ("You save 2 to 4 cents on every pound"), offering a limited amount at the losing price in connection with a required purchase of other commodities at prices high enough to afford petitioner a satisfactory profit on the transaction as a whole, without letting the customer know that the sugar was being sold on any other basis than that of the other commodities. Petitioner obtained its sugar in the open market from refiners and wholesalers. Competitors got their sugar from the same sources, of the same quality and at the same price. Sugar is a staple in the market. Price concessions upon large purchases are unobtainable. From the facts respecting petitioner's methods of advertising and buying and selling sugar respondent found, and properly so, in our judgment, that petitioner intentionally injured and discredited its competitors by falsely leading the public to believe that the competitors were unfair dealers in sugar and the other commodities which petitioner was offering in connection with sugar.

Petitioner purchased 75 per cent. of its teas from wholesalers and importers in the United States. The remainder it purchased through its representative Peterson in Japan; but there was no proof that Peterson made or was qualified to make "selections in person" or "first-crop pickings from upland soil." All of petitioner's coffees were purchased from wholesalers and importers in the United States. Respondent found that petitioner's advertisements of teas and coffees were false and designed to deceive the public and injure competitors.

By the order, issued on June 24, 1918, petitioner was commanded' to desist from:

"(1) Circulating throughout the states and territories of the United States and the District of Columbia catalogues containing advertisements offering for sale sugar, wherein it is falsely represented to its customers or prospective customers of said defendant or to customers of competitors, or to the public generally, or leads them to believe, that because of large purchasing power· and quick-moving stock, defendant is able to sell sugar at a price lower than its competitors;

"(2) Selling, or offering to sell, sugar below cost through catalogues circulated. throughout the states and territories of the United States and the District of Columbia among its customers, prospective customers and customers of its competitors;

"(3) Circulating throughout the various states and territories of the United States and the District of Columbia, among customers, prospective customers· and customers of its competitors, catalogues containing advertisements representing that defendant's competitors do not deal justly, fairly and honestly with their customers;

"(4) Circulating throughout the various states and territories of the United· States and the District of Columbia, among customers, prospective customers or customers of its competitors, catalogues containing advertisements offering for sale its teas, in which said advertisements it falsely stated that the defendant sends a special representative to Japan who personally goes into the tea gardens of said country and personally supervises the picking of such teas;

"(5) Circulating through the various states and territories of the United· States and the District of Columbia, among customers, prospective customers or customers of its competitors, catalogues containing advertisements offering for sale its coffees, in which it falsely stated that the defendant purchases all ·of its coffees direct from the best plantations in the world."

[2, 3] I. Petitioner insists that the injunctional order was improvidently issued because, before the complaint was filed and the hearing. had, petitioner had discontinued the methods in question and, as stated in its answer, had no intention of resuming them. For example,. no sugar offers of the character assailed were made after August, 1917. But respondent was required to find from all the evidence before it what was the real nature of petitioner's attitude. It was permissible for respondent to take judicial notice of the government's wartime control of sugar sales and consumption. It was also proper to note that petitioner was contending (and still contends) that the act is void for indefiniteness, that the act is unconstitutional, and that the act, even if valid, under any proper construction has not been infringed by petitioner's practices. In Goshen Mfg. Co. v. Myers Mfg. Co., 242 U. S. 202, 37 Sup. Ct. 105, 61 L. Ed. 248, which was a suit for infringement of a patent, the defendant company averred and introduced evidence to prove that six months before the bill was filed. and with notice to complainant it had sold its factory, wound up its business, and had no intention of resuming. But throughout the intervening period and also in the answer to the bill the defendant company was attacking the validity of the patent and the right of the complainant to compel desistance. This conduct was held to be such a continuing menace as to justify the maintenance of the bill. So here, no assurance is in sight that petitioner, if it could shake· respondent's. hand from its shoulder, would not continue its former course.

[4] II. Petitioner urges that the declaration of section 5 must be:

held void for indefiniteness unless the words "unfair methods of competition" be construed to embrace no more than acts which on September 26, 1914, when Congress spoke, were identifiable as acts of unfair trade then condemned by the common law as expressed in prior cases. But the phrase is no more indefinite than "due process of law." The general idea of that phrase as it appears in Constitutions and statutes is quite well known; but we have never encountered what purported to be an all-embracing schedule or found a specific definition that would bar the continuing processes of judicial inclusion and exclusion based upon accumulating experience. If the expression "unfair methods of competition" is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon "unsound mind," "undue influence," "unfaithfulness," "unfair use," "unfit for cultivation," "unreasonable rate," "unjust discrimination," and the like. This statute is remedial, and orders to desist are civil; but even in criminal law convictions are upheld on statutory prohibitions of "rebates or concessions" or of "schemes to defraud," without any schedule of acts or specific definition of forbidden conduct, thus leaving the courts free to condemn new and ingenious ways that were unknown when the statutes were enacted. Why? Because the general ideas of "dishonesty" and "fraud" are so well, widely and uniformly understood that the general term "rebates or concessions" and "schemes to defraud" are sufficiently accurate measures of conduct.

On the face of this statute the legislative intent is apparent. The commissioners are not required to aver and prove that any competitor has been damaged or that any purchaser has been deceived. The commissioners, representing the government as parens patriæ, are to exercise their common sense, as informed by their knowledge of the general idea of unfair trade at common law, and stop all those trade practices that have a capacity or a tendency to injure competitors directly or through deception of purchasers, quite irrespective of whether the specific practices in question have yet been denounced in common-law cases. But the restraining order of the commissioners is merely provisional. The trader is entitled to his day in court, and there the same principles and tests that have been applied under the common law or under statutes of the kinds hereinbefore recited are expected by Congress to control. This prima facie reading of legislative intent is confirmed by reference to committee reports and debates in Congress, wherein is disclosed a refusal to limit the commission and the court to a prescribed list of specific acts. Cong. Rec. 63d Cong. 2d Session, pp. 13, 18, 533, 12246. And this interpretation is not affected by the subsequent adoption of the Clayton Act, October 15, 1914 (38 Stat. 731, c. 323), condemning certain specific acts.

[5] III. But such a construction of section 5, according to petitioner's urge, brings about an unconstitutional delegation of legislative and judicial power to the commission. Grants of similar authority to administrative officers and bodies have not been found repugnant to the Constitution. Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525; Union Bridge Co. v. United States,

204 U. S. 365, 27 Sup. Ct. 367, 51 L. Ed. 523; Penn. Rld. Co. v. International Coal Co., 230 U. S. 184, 33 Sup. Ct. 893, 57 L. Ed. 1446, Ann. Cas. 1915D, 315; National Pole Co. v. Chicago & N. W. Ry. Co., 211 Fed. 65, 127 C. C. A. 561.

With the increasing complexity of human activities many situations arise where governmental control can be secured only by the "board" or "commission" form of legislation. In such instances Congress declares the public policy, fixes the general principles that are to control, and charges an administrative body with the duty of ascertaining within particular fields from time to time the facts which bring into play the principles established by Congress. Though the action of the Commission in finding the facts and declaring them to be specific offenses of the character embraced within the general definition by Congress may be deemed to be quasi legislative, it is so only in the sense that it converts the actual legislation from a static into a dynamic condition. But the converter is not the electricity. And though the action of the commission in ordering desistance may be counted quasi judicial on account of its form, with respect to power it is not judicial, because a judicial determination is only that which is embodied in a judgment or decree of a court and enforceable by execution or other writ of the court.

[6] IV. In the second paragraph of the order petitioner is commanded to cease selling sugar below cost. We find in the statute no intent on the part of Congress, even if it has the power, to restrain an owner of property from selling it at any price that is acceptable to him or from giving it away. But manifestly in making such a sale or gift the owner may put forward representations and commit acts which have a capacity or a tendency to injure or to discredit competitors and to deceive purchasers as to the real character of the transaction. That paragraph should therefore be modified by adding to it "by means of or in connection with the representations prohibited in the first paragraph of this order, or similar representation."

Sufficient appears in this record and in the presentation of the case to warrant us in expressing the belief that petitioner's business standards were at least as high as those generally prevailing in the commercial world at the times in question, and that the action of the commission is to be taken rather as a general illustration of the better methods required for the future than a specific selection of petitioner for reproof on account of its conduct in the past.

Respondent is directed to modify its order as above stated; and in other respects the petition is denied.

ALSCHULER, Circuit Judge (dissenting in part). In my judgment the order of the commission should be further modified by striking out the third paragraph, which relates to alleged representation that petitioner's competitors do not deal fairly and honestly with their customers. In so far as the sugar, coffee, and tea advertisements ascribe petitioner's asserted lower prices and superior qualities to quantity purchases and special facilities and advantages for inspection, selection, and purchasing, they would tend to negative any im-

putation upon competitors of unfair dealing with their patrons. I believe the charge of imputing to competitors unfair dealing with their patrons rests wholly on petitioner's so-called "Caveat Emptor" advertisement in its catalogue of March and April, 1916, wherein the public is cautioned in regard to white sugar, stating that some is cane and some beet sugar, alike in appearance, but the former usually higher in price; that petitioner plainly designates which of the two it offers, and the query is suggested, where else are goods so plainly described, and whether the customer gets elsewhere what he thinks he is buying. It seems to me that this does not amount to more than a statement or boast that petitioner, without being asked, describes the white sugars it proposes to sell, and the intimation is carried that competitors do not volunteer such description, but it is not suggested that they actually misrepresent the truth.

The facts before the commission appear by stipulation, and those concerning this advertisement, aside from the advertisement itself are as follows:

"When Mr. A. M. Daly, the attorney in charge of the investigation in these proceedings, was in Chicago, in March, 1916, he submitted to Mr. A. V. H. Mory, chief chemist of Sears, Roebuck & Co., and Mr. Joseph Scott, manager of the grocery department, a copy of the advertisement entitled 'Caveat Emptor' hereinbefore mentioned, and hereto attached, and requested them to state their views as to this particular advertisement and what it meant. They stated that this advertisement was for the purpose of calling attention to the distinction between beet sugar and cane sugar and laying stress upon the point of the facilities that Sears, Roebuck & Co. have for marking everything plainly so that the customer would know better from description the exact nature of what he was buying. After this explanation Mr. Daly went to his hotel. In a short time Mr. Mory called on him there and stated in substance that he had submitted the above-mentioned advertisement to Mr. A. H. Loeb, the vice president of Sears, Roebuck & Co., and that Mr. Loeb said that this course of advertising was unfair and unjust and declared that it must be discontinued, and further that it was against the policy of the house to send out such advertisements. Thereupon, on March 28, 1916, Mr. A. V. H. Mory, chief chemist, wrote to the commission in part as follows: 'The young man who wrote this was in to-day and I pointed out to him wherein he had made a mistake and acted against house policy. He promised to use the soft pedal on all references to the dealer in the future. He tells me that this is an angle that had not occurred to him. He had not thought of the write-up in the light of a criticism of the dealer, so intent was he on pointing out that with our system of marking everything plainly and our facilities for knowing what we are selling the customer would know better from our description the exact nature of what he was buying, in the case of those things difficult to judge than if he had them placed before him—which of course is true.'"

But assuming, as did petitioner's vice president, that this advertisement does carry the imputation that competitors deal unfairly with their customers, under the circumstances indicated by the quotation ought this advertisement to be the basis of a finding and order? The publication was in the catalogue for March and April, 1916. The complaint was filed nearly two years afterwards. The act authorizes the commission to proceed when it shall have reason to believe that unfair methods of competition are or have been used, "and if it shall appear to the commission that a proceeding by it in respect thereof would be of interest to the public." In a monitory proceeding such

as this seems to be, it could hardly be said that it would be "of interest to the public" to predicate action on a transgression for which due amends had long before been made, without remotest cause to believe there would be a repetition. To revive a stale advertisement of this nature which the advertiser immediately after the publication distinctly disavowed as having been unintentionally and inadvertently unfair to competitors, and ordered discontinued, without directly or indirectly repeating or renewing it for so long an interval, far from subserving the public interest, might, in my judgment, have the contrary tendency of raising an imputation of oppressive or at least uncalled-for action, in predicating any proceeding or order on this advertisement.

Nor am I impressed with the authoritative relevancy here of decisions respecting injunctions. In a proceeding such as this, neither remedial nor punitive, decisions of courts respecting injunctional relief in equity are not more analogous than are common-law decisions defining unfair trade practices, arising out of controversies between individuals, as fixing thereby the limitation of the commission's authority or scope.

The suggested modification would necessitate corresponding modification of the commission's findings of facts, eliminating paragraphs numbered 4 and 5 thereof. Paragraphs 2, 6 and 7 (as well as paragraphs 4 and 5) of the findings state the circulation of the several advertisements to have been in each case for "more than two years last past," indicating thereby the two years next before the date of the findings, which is June 24, 1918. This is no contravention of the stipulated fact that none of the advertisements were more recent than August, 1917—some of them even antedating the passage, September 24, 1914, of the Trade Commission Act itself. These findings should, in my judgment, be modified to comply with the stipulated facts.