## L. B. SILVER CO. v. FEDERAL TRADE COMMISSION OF AMERICA.

(Circuit Court of Appeals, Sixth Circuit. February 16, 1923.)

### No. 3648.

1. **Trade-marks and trade-names and unfair competition ⬳80½, New, vol. 8A Key-No. Series—Finding advertised opinion as to breed of hogs was not true held not to establish unfair competition.**

   Where the evidence before the Trade Commission showed an honest difference of opinion between experts as to whether the stock from which respondent bred its hogs was a separate breed, or only a different strain of the same breed, a finding that an advertisement that it was a separate breed was false does not establish unfair competition with breeders of the other breed, since dealers generally are familiar with the facts and would not be deceived thereby, and therefore an order requiring it to desist from making such statements in its advertisements will be modified by eliminating that provision.

2. **Trade-marks and trade-names and unfair competition ⬳80½, New, vol. 8A Key-No. Series—Definition of unfair methods of competition is question for the courts.**

   Since Federal Trade Commission Act, § 5 (Comp. St. § 8836e), does not define the term "unfair methods of competition" thereby prohibited, the definition of that term is a question for the ultimate determination of the courts.

3. **Trade-marks and trade-names and unfair competition ⬳80½, New, vol. 8A Key-No. Series—Public policy declared in Sherman Act considered in defining unfair competition.**

   In determining the meaning of unfair methods of competition, as used in the Federal Trade Commission Act (Comp. St. § 8836a et seq.), a court must give due consideration to the public policy declared in the Sherman Anti-Trust Act (Comp. St. § 8820 et seq.).

4. **Trade-marks and trade-names and unfair competition ⬳80½, New, vol. 8A Key-No. Series—Order to desist from advertising weight of two hogs held unsupported by complaint or facts.**

   In an order issued by the Federal Trade Commission against a company engaged in the breeding and sale of hogs, a paragraph requiring it to desist from advertising that two of its hogs weighed 2,806 pounds, in such a way as to mislead a prospective purchaser to believe those hogs were then or recently had been in existence, was unsupported by the complaint, which contained no charge that respondent advertised it had for sale the progeny of those hogs, and by the facts showing that the advertisement was first made in 1883, and that excessive weight hogs were not desirable or used for breeding purposes.

   Denison, Circuit Judge, dissenting in part.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

. Complaint by the Federal Trade Commission of America against the L. B. Silver Company, charging the respondent with using unfair methods of competition in interstate commerce. On petition by the company to revise an order of the Commission requiring the company to desist from certain statements in its advertisements. Order modified.

In March, 1920, the Federal Trade Commission issued a complaint against the L. B. Silver Company, a corporation, charging the respondent with using unfair methods of competition in interstate commerce in violation of the provisions of section 5 of the Act of Congress approved September, 26, 1914, creating the Federal Trade Commission. Compiled Statutes, § 8836a et seq.

The complaint alleged in substance that the respondent had made and was continuing to make false representations to the public that it is a breeder and shipper of thoroughbred hogs; that the Ohio Improved Chesters or famous O. I. C. hogs is a breed of hogs separate and distinct from the Chester White hogs and superior thereto; that it advertised Chester White hogs for sale at a price less than that for which it would sell O. I. C. hogs and would either fill orders for Chester White with inferior animals of the hogs bred by it, or notify its customers that it had no Chester White hogs; that the O. I. C. hog is not susceptible to cholera, pneumonia, and other diseases and possesses a power to repel disease in a degree unknown to other breeds; that it had secured greatly reduced express rates on live stock and had advertised that two of the O. I. C. breed of hogs weighed 2,806 pounds, in such a way as to mislead prospective purchasers into believing that two O. I. C. hogs weighing that amount were then or recently had been in existence.

The amended answer alleged in substance that the petitioner is a breeder of Ohio Improved Chester White hogs, familiarly known to the trade as O. I. C. hogs; that the O. I. C. hogs are a separate and distinct breed from the Chester Whites and superior thereto; that since December 1, 1918, it has voluntarily and permanently discontinued all advertising to the effect that it would sell Chester White hogs at a price less than that for which it would sell O. I. C. or at any other price and denied that it had represented the O. I. C. breed was not susceptible to cholera and other diseases, but that it had in good faith represented that it is less susceptible to disease than other breeds, but that it would not guarantee its hogs to be immune therefrom; that it had never represented that its hogs are not subject to pneumonia, but that it did represent that there had been no cholera, foot and mouth, or other contagious disease in petitioner's locality for over fifty years and that during that period of time it had never lost a pig from cholera or any other contagious disease; and that these representations are true.

The amended answer further avers that since the 1st day of January, 1918, the petitioner voluntarily and permanently discontinued all representations as to reduced or special express rates and admits that it advertised that two of petitioner's breed of hogs weighed 2,806 pounds, but denies that such representations were so made as to mislead a prospective purchaser, and that if they were ever so used as to be in the present tense such advertising had been voluntarily discontinued many years ago.

Upon the issue so joined the Federal Trade Commission made separate findings of fact and made and entered a modified order that the respondent, its officers, directors, agents, and employés cease and desist from representing, in interstate commerce, to the public, by circulars, pamphlets, catalogues, trade journals, periodicals, newspapers, or otherwise:

(1) That the so-called Ohio Improved Chesters, or O. I. C.s, or Famous O. I. C.s, are a breed of hogs separate and distinct from the Chester White breed of hogs.

(2) That it has no Chester White pigs, when in fact it has Chester White pigs, though called by it O. I. C. pigs; or that it has Chester White pigs and O. I. C. pigs as if the latter were a different and more valuable breed, when in fact they are one and the same breed; or that it has no Chester White pigs with which to fill orders for Chester White pigs, at its quoted prices or otherwise, when in fact it has Chester White pigs, though called by it O. I. C. pigs;

or that it has discontinued to breed Chester White pigs, when in fact it is continuing to breed them, though designated by it O. I. C. pigs.

(3) That the so-called O. I. C. pigs, as a breed, or otherwise, are not liable to cholera, foot and mouth disease, tuberculosis, and other contagious diseases; that there has been no cholera, foot and mouth disease, tuberculosis, nor other contagious diseases in respondent's locality; that the O. I. C. pigs possess a power to resist disease in a degree unknown to other breeds; that in localities where contagious diseases have swept off the dark and black hogs the O. I. C.s were unaffected; from in any way representing to the public that the O. I. C. pigs are more resistant to disease than are other breeds of hogs.

(4) That in the shipment of live stock the respondent enjoys or has enjoyed, either or both, from express companies rates of transportation lower than the rates granted to other shippers of live stock by the said express companies.

(5) That two of its hogs weigh 2,806 pounds; that such hogs are in existence; that their progeny is for sale by the respondent.

John G. White, of Cleveland, Ohio (White, Cannon & Spieth, of Cleveland, Ohio, on the brief) for petitioner.

Charles Melvin Neff and W. H. Fuller, both of Washington, D. C., for respondent.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge (after stating the facts as above). The petitioner is a corporation and the successor in business of the partnership of L. B. Silver & Son, which partnership was the immediate successor in business of L. B. Silver, who for many years was a successful breeder of cattle, horses, and hogs. In 1863, in Ohio, L. B. Silver undertook to improve the Chester White hog that had originated in Pennsylvania.

It is claimed by the petitioner that L. B. Silver, in his initial efforts to improve the Chester White hogs, crossed that stock with a mammoth or large white English hog. This, however, is disputed. Silver is dead. There was at that time no herd book for either the O. I. C. or the Chester White hogs, and for that reason this disputed question is not susceptible of direct proof, but must rest on tradition only. But this tradition finds some support not only in the testimony of witnesses to whom L. B. Silver made this statement, but also in a pamphlet written and distributed by him in 1870, in which appears the following statement:

"In-and-in breeding is recommended by some, but our observation goes to show that it should not be practiced to any great extent, as its tendency is to weaken the constitution of the future animal."

The claim that he crossed the Chester White stock with a mammoth or large white English hog is entirely consistent with this advice to other breeders contained in this pamphlet, entitled "Hints to Stock Breeders." However that may be, the Commission found that from the very beginning of L. B. Silver's business, and down to the present time, the respondent and its predecessor in business never used boars of any breed other than the pure Chester White, and for the purposes of this case that finding of fact by the commission will be accepted as final and conclusive.

Regardless, however, of whether L. B. Silver originally crossed this stock with a mammoth or large white English hog, there is no conflict in

the evidence that by careful selection and systematic mating he did accomplish a substantial improvement in the original stock and that the result of his efforts was a valuable contribution to progress in swine breeding.

In 1870 L. B. Silver issued the pamphlet, "Hints to Stock Breeders," to· which reference has heretofore been made.· In this pamphlet he made public and definite claim that the hogs bred by him were a distinct breed from the Chester White, which he had named Ohio improved Chester White breed, now known as the Ohio Improved Chester or O. I. C. It further appears from the evidence that L. B. Silver, his successors in business, including this petitioner and many other O. I. C. breeders for a half century prior to the filing of this complaint, have openly, notoriously, and persistently made the claim that the Ohio Improved Chesters are a separate and distinct breed of hogs from the Chester White and no action was taken by any one interested therein to challenge the truth of this claim until 1916, and again in 1918, when complaints were made to the postal authorities. Each of these complaints failed in the accomplishment of its purpose. ·

While these claims, no matter how long· made, cannot change the facts, nevertheless they are of importance in determining the question of unfair methods of competition in this respect.

It further appears from the evidence that other breeders, either inspired by Silver's success, or acting upon their own initiative, have developed what is known as the "Modern Chester White," which is also a decided improvement over the foundation stock. While it is conceded that the present O. I. C. hog is superior to·and has many marked characteristics with power to transmit the same, that distinguishes it from the Chester White as it existed in Pennsylvania and New York in 1863, nevertheless it is insisted that the comparison should now be made between the Modern Chester White instead of with the original stock. The further claim is made that the O. I. C. hog has no characteristics that distinguishes it from the Modern Chester White. Upon this question there is a serious conflict in the evidence.

There is also a sharp and irreconcilable conflict in the expert opinion evidence touching the question as to what constitutes a distinct and separate breed, but disregarding the claim of the petitioner that L. B. Silver crossed Chester Whites with a mammoth or large white English hog, there is practically no substantial conflict in the evidence tending to establish the facts from which these breeders and experts reach different conclusions. One group of experts and breeders are of the opinion that there cannot be a distinct breed originated where the blood line goes back to the old foundation stock; that, while different strains or types may be developed in this way, it is nevertheless the same breed. Another group of breeders and experts are of the opinion that a distinct breed may be originated through selection and in-and-in breeding. Each of the individual members of these groups that have testified in this case or whose books on live stock breeding have been admitted in evidence, though differing in opinion based on the same state of facts, appears to be entirely honest, sincere, and equally firm in the belief that his conclusion is the right one.

The situation presented by this conflict of opinion among experts and breeders is fully discussed and its effect determined by the Supreme Court in the case of American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90. In Bruce v. U. S., 202 Fed. 98, 120 C. C. A. 370, the Court of Appeals held that it was error for the trial court to refuse to charge that " * * * if the jury found that whether the substance was remedial in character when exhibited as part of the treatment of morphinism was merely a matter of opinion among medical men, defendants must be acquitted" of the charge of using the mails for fraudulent purposes. It was also held by this court in the case of Harrison v. U. S., 200 Fed. 662, 665, 119 C. C. A. 78, 81, that a scheme to defraud "cannot be found in any mere expression of honest opinion."

As heretofore stated, in the early years of Mr. Silver's activities as a breeder of swine there was no herd book for either the Chester White or the Ohio Improved Chester White. When a herd book known as the "National Chester White Swine Record" was established, Mr. Silver recorded his hogs in its book, but at the same time insisted that his doing so should not be regarded as a surrender of his claim to a distinct breed. Later, when "The International Ohio Improved Chester Breeders' Association" was organized, Mr. Silver recorded his hogs in its book. In 1897, after this organization ceased to function, an organization known as the O. I. C. Swine Breeders was formed and established a herd book, in which was eligible to registry only swine that could trace its origin to the L. B. Silver herd. At the time this complaint was filed there were registered in this herd book about 950,000 hogs, tracing their ancestry to the Silver herd, and but 90,000 hogs registered in the herd books of the three Chester White associations. There is also evidence tending to prove that there are about 20,000 O. I. C. breeders, all of whom claim and advertise that it is a separate and distinct breed.

It further appears from the evidence that the O. I. C. hogs were classed as a separate breed of hogs, by many stock journals and publications of like nature, including scientific books on stock breeding. While it is true that some of these editors and authors relied upon the claims and representations made by Silver and his successors, yet others made independent investigation of the facts upon which they based their conclusions.

There is also substantial evidence in this record tending to prove that there is no sharp distinction between the term "breed" and "strain" as used by geneticists, and that these terms are used indiscriminately by a great many breeders, so that in so far as affects the disposition of this case, it is not of controlling importance whether the one group of experts are correct in their opinion that the O. I. C.'s are but a strain of the Chester White or the other group are correct in the opinion that it is a distinct and separate breed.

Aside from these considerations, it is apparent from the evidence in this case that this controversy does not vitally concern the general purchasing public. On the contrary, it is a controversy largely between rival breeders of hogs, or more particularly between rival hog breeders associations having and maintaining herd books. If the O. I. C. hogs

were inferior to the Chester Whites and not of their breed and the petitioner advertised them as Chester Whites, such practice would, no doubt, constitute unfair competition as against Chester White breeders; but it is admitted that not only are the O. I. C. hogs superior to the Chester White hogs of 1863, but that they are the equal of the Modern Chester Whites. That being true, it necessarily follows that neither the general public as consumers nor the small part of the public engaged in the breeding of swine and particularly in the breeding of O. I. C. and Chester White swine can be misled to their prejudice by this claim of the petitioner, nor induced thereby to purchase a hog inferior to the Modern Chester White. Whether the O. I. C. should or should not be classed or designated as a different and distinct breed, and whether they are or are not superior to the Modern Chester Whites, is a question that each breeder will decide for himself, and he will not change his individual opinion upon this subject no matter what this court or scientific experts on breeding may determine to be technically essential to the origination of a new and distinct breed. There is evidence in this record tending to prove that breeders pay little or no attention to scholastic experts, who are designated by them as "book men" dependent upon breeders having actual experience, for the data upon which they base their conclusions.

[1] For the purpose of this case it may be conceded that the conclusion reached by the Federal Trade Commission from the facts found by it that the O. I. C. and Chester White hogs are one and the same breed is a finding of fact within the meaning of section 5 of the Federal Trade Commission Act, and, as such, equally conclusive as other findings of fact made by that commission. But, in view of the fact that there is a substantial conflict of opinion upon this subject, as evidenced by the testimony not only of scientific men, but also by the testimony of practical and experienced breeders of swine, it does not necessarily follow from this finding that the assertion of an honest opinion upon this subject either by way of advertisement or otherwise, by any one breeder or any number of breeders, constitutes unfair methods of competition where the facts upon which such opinion is based are generally known to that part of the public concerned in the controversy, even if it should appear from a scientific standpoint that such opinion is not technically correct.

[2, 3] The statute does not define the term "unfair methods of competition," therefore the question is one for the ultimate determination of the courts, as are the phrases "unsound mind," "undue influence," "unfair use," "due process of law," found in many other statutes. Federal Trade Commission v. Gratz, 253 U. S. 421, 427, 40 Sup. Ct. 572, 64 L. Ed. 993; Sears, Roebuck & Co. v. Federal Trade Commission, 258 Fed. 307, 311, 169 C. C. A. 323, 6 A. L. R. 358. In determining the meaning of "unfair methods of competition" within the meaning of the Federal Trade Commission Act, a court must give due consideration to the public policy declared in the Sherman Act (Comp. St. § 8820 et seq.), Federal Trade Commission v. Beech-Nut Packing Co., 257 U. S. 441, 453, 42 Sup. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882, and cases there cited.

In the case of the Federal Trade Commission v. Winsted Hosiery Co., 258 U. S. 483, 42 Sup. Ct. 384, 66 L. Ed. 729, decided by the Supreme Court April 24, 1922, the Winsted Hosiery Company placed upon the cartons in which its underwear was sold the brands or labels, "Natural Merino," "Gray Wool," "Natural Wool," "Natural Worsted," or "Australian Wool," but none of this underwear was all wool, and much of it contained as little as 10 per cent.

The Supreme Court held that these brands and labels are literally false and all except the label "Merino" palpably so; that all are calculated to deceive, and do in fact deceive a substantial portion of the purchasing public, and therefore the proceeding to stop the practice was in the interest of the public. The court further found that the practice of using these brands and labels also constituted an unfair method of competition as against manufacturers of all wool and knit underwear and as against those manufacturers of mixed wool and cotton underwear who brand their products truthfully.

Section 5 of the Federal Trade Commission Act authorizes the filing of a complaint when such proceedings would be to the interest of the public. Whether the Federal Trade Commission has jurisdiction to determine complaints as to unfair methods of competition where the general public, the ultimate consumer, is not misled, deceived, or prejudiced thereby, but involves only a controversy between dealers and breeders, is a question unnecessary to decide in this case.

The claim that the O. I. C. hog is a separate and distinct breed from the Chester White is neither palpably nor literally false, as were the brands and labels used by the Winsted Hosiery Company. On the contrary, the truth of this claim finds equal support in the testimony of expert and experienced breeders, as does the claim that it is false and unwarranted by the facts. Nor does the claim tend to lessen competition or create monopoly in violation of the Anti-Trust Act. On the contrary, it places the O. I. C. hog in direct competition with the Chester White, while, if the O. I. C. are required to be advertised and marketed as Chester Whites the tendency of such requirement would be to destroy competition and create a monopoly in the breeding and marketing of Chester Whites.

For the reasons above stated, a majority of this court is of the opinion that the petitioner is not guilty of unfair methods of competition by advertising the O. I. C. hog as a separate and distinct breed of hogs from the Chester White so long as it does not include in its advertisements the claim found to be untrue by the Federal Trade Commission that the foundation stock of the O. I. C. was crossed by a "Mammoth" or large white English hog.

Paragraph 2 of the order to cease and desist, as it now reads, is inconsistent with paragraph 1 as above modified. In the opinion of a majority of this court, paragraph 2 should be changed to read as follows:

"That it has Chester White pigs for sale at a less price than O. I. C. pigs or at any other price, if it in fact has no Chester White pigs, as distinguished by it from O. I. C. pigs, for sale at quoted prices or otherwise."

There is substantial evidence in this record to sustain the findings of facts upon which paragraphs 3 and 4 of the modified order to cease and desist are predicated, and these paragraphs are approved. .

[4] Paragraph 5 is based solely upon paragraph 7 of the complaint. That paragraph charges in substance that respondent advertised that two O. I. C. hogs weighed 2,806 pounds, in such a way as to mislead a prospective purchaser to believe these hogs were then, or recently had been, in existence, whereas said representations refer to hogs which are alleged to have existed in the year 1868. There is no charge in the complaint that respondent advertised that it had for sale the progeny of these hogs. It follows that the allegations of this complaint do not support this paragraph. In view of the undisputed evidence that this claim was made in the advertising as early as 1883, that its truth is not challenged by complaint or evidence, that excessive weight hogs are not desirable or used for breeding purposes, that some years before the filing of this complaint, when respondent's attention was called to the fact that its advertisement read, "Two hogs weigh 2,806 pounds," it at once changed this to read "Two hogs weighed 2,806 pounds," and it has continued so to read ever since, it would not appear that this would involve public interest or constitute unfair methods of competition. In any event, the evidence tending to prove that the respondent had in good faith abandoned this form of advertising long prior to the filing of this complaint, is not disputed by oral evidence or by circumstances. In the opinion of a majority of the court, the fifth paragraph of the modified order to cease and desist should be vacated.

It is unnecessary to discuss in detail the other questions presented by the petition to review in reference to hearsay evidence, leading questions, the admission of opinion testimony as to the ultimate fact to be decided by the Commission, and other similar questions of a more or less technical nature. It is sufficient to say that from the whole record it does not appear that the substantial rights of the petitioner have been prejudiced in any way by these alleged errors.

The first and second paragraphs of the order to cease and desist made and entered by the Federal Trade Commission will be modified to the extent hereinbefore stated and, as so modified, approved. Paragraphs 3 and 4 are approved as written without change or modification thereof. Paragraph 5 is vacated.

DENISON, Circuit Judge (dissenting in part). While I concur generally in the opinion of Judge DONAHUE as far as it goes, I see both the need and the occasion for a study of the scope and extent of the Commission's power along the line here involved, under section 5 of the act.(Comp. St. § 8836e).

In this matter, as in many others currently familiar, the Commission has adopted the theory that the "unfair methods of competition" denounced by section 5 include all false, not to say unethical, advertising and promotion of a particular article by which that fraction of the public desiring to purchase an article of that class may be, in a substantial way, misled. The vista of business censorship seen through such an opening is limitless. It extends to the advertising of fire sales

when there has been no fire, and of cut price sales when there has been no cut, provided sales are to be made across a state line. Such suggestions are not fancifully extreme. In the present case, thousands of pages of testimony have been taken, thousands of dollars of expense incurred, for the government and for the respondents, and the time and attention of the Commission and of the Circuit Court of Appeals consumed to the total extent of many days—all over questions of porcine genealogy and eugenics. In another recent case, before the Commission and another Circuit Court of Appeals, a similar amount of effort was expended concerning the truthfulness of advertising claims to merit in a medicinal condiment for live stock—the order to desist prohibiting, among other things the use of a fictitious testimonial. Guarantee Veterinary Co. v. Federal Trade Commission (C. C. A. 2) 285 Fed. 853. I do not believe that the Federal Trade Commission was created for any such purpose, or that the time and efforts of the federal courts should be devoted to such situations.

A study of the Congressional Record convinces me that the Federal Trade Commission Act (Comp. St. § 8836a et seq.) was wholly collateral to the Sherman and other anti-trust acts, and that the "unfair methods of competition," intended to be reached by section 5, are only such methods as tend toward that monopoly or restraint of competition which the anti-trust acts prohibit. The act was the ultimate result of House Bill 15613, in the Second Session of the 63d Congress, introduced by Mr. Covington on April 13, 1914, and it was the often declared partial fulfillment of the general anti-trust program adopted by both parties in the previous political campaign, and specifically laid before Congress for its attention by the address of President Wilson on the subjects of trusts and monopolies, made January 20, 1914. Several other bills of more or less similar purport were introduced and referred, as this one was, to the committee on interstate and foreign commerce, or, as others were, to the judiciary committee. The committee reports and congressional debates, which from this beginning led up to the act as finally passed, cover nearly a thousand printed pages. They have all been read, with reasonably careful attention. Absolute inerrancy of review and inference cannot be claimed, but with reasonable certainty it may be said that the theory that the Commission was being endowed with powers and duties which went beyond the scope of the underlying purpose of the anti-trust acts was never accepted by either house of Congress.

The chief controversy on the general subject was between those who wished to create a commission only for investigation and publicity and those who wished a commission "with teeth." House Bill 16513, as introduced and as reported out by a majority of the committee, was of the former class. It contained provisions for reports by interstate corporations, for investigations, for publicity, and for aiding the courts when a dissolution was decreed under the anti-trust laws. It contained nothing resembling the present section 5. The majority report said that:

"The bill provides for an Interstate Trade Commission in accordance with the views of the President, expressed in his message to Congress in January last, on the subject of trusts and monopolies."

289 F.—63

The Republican members of the committee (then in a minority) expressed their "general concurrence" in the majority report, pointing out that they regarded it as a fulfillment of the Republican party platform pledge. Mr. Lafferty presented a minority report, vigorously protesting against the lack of any sufficient power in the Commission to do anything effective in aid of anti-trust laws. It is made apparent in this minority report, as repeatedly in other places, that the bill was a companion to the one which, at the same session, became the Clayton Act (38 Stat. 730), and that, with one bill extending and defining anti-trust laws, and with another creating a suitable commission for their enforcement, the administration anti-trust program was fulfilled. In another minority report, Mr. R. B. Stevens also objected because sufficient powers were not given. His report refers to another bill, introduced by him (H. R. 15660), which was afterwards used in the Senate as the basis of the later formulated section 5, and the Stevens report thus gives the key to the true definition of section 5 when it says:

"If we are to rely on the theory of competition to protect the public from large corporations, it is imperative that the government shall see to it that competition is on fair and equal terms. The experience the government has had in the enforcement of the Sherman anti-trust law, interstate commerce law, and the pure food law, proves conclusively that this can be done successfully only through an administrative board having general power to prevent unfair competitive practices."

This bill, substantially as reported, passed the House, went to the Senate, and was referred to the interstate commerce committee. It reported out a substitute which made a number of changes, not now important, as to the examining, publicity, and dissolution aiding features, but added section 5 in its present form, except for certain changes to be later noted.[1] In its report (page 11090, vol. 51, Cong. Rec.) the committee discussed the general purposes of the bill, as a collateral anti-trust act. In explaining section 5 the report says:

"The committee was of the opinion that it would be better to put in a general prohibition condemning unfair competition than to attempt to define the numerous unfair practices, such as local price cutting, interlocking directorates, and holding companies, intended to restrain substantial competition."

The debates in the Senate cover 400 pages of the record (scattered from page 10376 to page 13319, parts 12 and 13, vol. 51, Cong. Rec.), and are devoted largely to the meaning of "unfair competition." The opposition to this section was mainly upon two grounds: First, That "unfair competition" was of such vague and indefinite meaning that giving a commission power to prohibit would be a delegation of legislative power; second, that the phrase, by long judicial construction, meant, and meant only, "palming off" the goods of one as those of another, and on that subject no additional law was needed. The advocates of the section generally insisted that "unfair competition" was those practices which tended to destroy competition, and so tended

[1] In the debates it is stated (e. g., page 11538) that this section 5 was brought to the committee by Mr. Stevens, as founded on his H. R. 15660, and as said to have been urged by Mr. Brandeis and to have been approved by the President.

to monopoly, and that the general character of these practices had been so well defined by the Supreme and other courts in the anti-trust cases that the phrase was no longer unduly vague. What Senator (formerly Circuit Judge) Colt believed was the dominant thought, he formulated, when stating the different views that might finally be taken, as follows (page 13154):

"Fourth. A court may take the view * * * that it was plainly the intention of Congress to use these words in the broad sense of comprising the various steps which lead up to monopoly, and hence that 'unfair competition,' within the meaning of the law, signifies the various things which have been forbidden by the courts in decrees entered under the anti-trust laws, and all transactions of a similar nature. That such was the intention of Congress, a court may say, clearly appears from the arguments in the Senate. And in support of this construction it may be further urged that Congress was engaged in a general scheme of legislation supplementary to the Sherman law, and hence that it intended that these words should cover all those transactions which any person may employ in a scheme or plan to establish a monopoly in violation of law."

It is not easy to say just how far quotations from the debates themselves are admissible as evidence of intent. Senator Newlands was the chairman of the committee, Senator Cummins a leading member, and they and most of the advocates of the bill spoke in explanation of the committee report. The line between this and mere debate is not easy to draw. In reporting the substitute, containing this section 5, Senator Newlands said (page 10376):

"The need has long been felt for an administrative board which should act in these matters in aid of the Sherman anti-trust law."

Senator Cummins said (page 11103):

"The unfair competition sought to be reached by the section [5] is that violence of competition, conducted through unfair practices and methods, which will ultimately result in the extinction of the competition and the establishment of monopoly. * * * "

At page 11105:

"We are here endeavoring to sustain competition; * * * it is the only justification for the establishment of a trade commission. * * * We have chosen to report a rule for the trade commission in the language which has been suggested, viz. 'unfair competition.' It is that competition which is resorted to for the purpose of destroying competition, of eliminating a competitor, and of introducing monopoly. That is the 'unfair competition' which this bill endeavors to prevent."

Seemingly authoritative statements of the same kind were too numerous for inclusion here. Some of them are collected in the margin.[2] The contentions that the phrase had any other meaning came

---

[2] Senator Newlands (page 11108) enumerates at length "the practices which are generally considered unfair." They all have to do with fraud or force used to destroy a competitor. He also said (page 11235): "The provision with reference to unfair competition is intended to disarm monopoly. It is monopoly, or the corporation possessing monopolistic tendencies, that engages in unfair competition, and unfair competition is a means of creating monopoly." He further stated (page 12030) the purpose of section 5 to be to "afford protection to numerous pigmies in business, that are being injured and destroyed by giant competitors, whose practices, while leading up to monopoly, do not as yet have the character of monopoly."

When Senator Williams (page 12210) said, "What is really meant in the

from those who opposed the section, because they thought the phrase covered nothing but "palming off,", or because they thought it covered everything. Nothing is found from its supporters indicating the possibility of any definition broader than Senator Cummins', except occasional broad language followed by some narrowing specification.[3] There was universal agreement, frequently expressed, that the bill was not intended to reach private controversies between rival traders.

True, it is not without importance that amendments were proposed, and defeated, expressly defining "unfair competition" along the lines of Senator Cummins' explanations (pages 13303–13314, 13325–13335). The record indicates no objection to the declared purpose of those proposing these amendments, but rather that their defeat was due to suspicion of amendments from "the enemies of the bill," fear that the restrictive definitions were imperfect, and knowledge that the bill would go to conference, where amendments could be made.

So it passed the Senate with section 5 prohibiting "unfair competition," and containing no express limitation to cases of public interest. The House refused to concur, and conference managers were appointed by both houses. The conferees reported a substitute bill, which (as to the matters now here involved) was like that passed by the Senate, except that section 5 was amended by changing "unfair competition" to "unfair methods of competition" in the prohibitory clause, and that there was inserted the clause found in the final act and reading, "and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public."

The Senate conference managers reported the changes made. There was little debate or comment. No reference is found to any supposed change in the prohibitions of section 5. The conference bill was

---

bill, when it says 'unfair competition,' is the unfair stifling of competition,' Senator Newlands replied (page 12211): "I want to do the same thing. * * * to prevent the stifling of competition by unfair means. * * * Those who support the bill have presented authorities * * * showing that the words 'unfair competition' have the very meaning of stifling competition by unfair means."

Senator Cummins said (page 11381): "The bill is in harmony with the purposes of the anti-trust statute. It has no other office, except to render the principle of that statute more effective than it now is." He supposed (page 11105) it would not apply to the case of one railroad misrepresenting the facilities of another, and so diverting custom. His further explanations (page 11455) quoted at length in 253 U. S. 435, 40 Sup. Ct. 572, 64 L. Ed. 993, q. v., are informing.

Senator Kenyon said (page 13156): "The difference between this act and the Sherman Act, * * * this can take hold of matters that are not in themselves sufficient to amount to a monopoly or to amount to a restraint of trade."

Senator Hollis said (page 12146): "If the proposed trade commission has its attention called to some unfair method of competition, it can immediately investigate, and if it decides that it is unfair competition, and may lead to monopoly or restraint of trade, it can prohibit it."

[3] For examples, see Senator Newlands' rather inclusive words (page 11112), and his interpretating enumeration (page 11113), and Senator Robinson's corresponding expressions (pages 11228, 11230), but then naming "nearly all the methods of unfair competition now in use."

passed. The House conference managers made a report, explaining section 5, which had been added. The report said (page 14924):

"Section 5 declares unfair methods of competition to be unlawful, and empowers the Commission to order a discontinuance of such methods. It is now generally recognized that the only effective means of establishing and maintaining monopolies * * * is the use of unfair competition. The most certain way to stop monopoly at the threshold is to stop unfair competition."

Mr. Covington, one of the House conference managers, and chairman of the subcommittee in charge of the bill, while explaining section 5, said (page 14927):

This section " * * * embraced within its broad and elastic scope all the specific practices against which there had been prohibitions in the Clayton bill. * * * The most certain way to stop monopoly at the threshold is to prevent unfair competition. This can be best accomplished through the action of an administrative body of practical men. * * * "

And (on page 14929):

"We are seeking here, not to enter into any unknown or speculative realm of the law, but to deal, as we ought to deal, with those practices of unfair trade in their incipient stages which, if left untrammeled and uncontrolled, become the acts which constitute, in their culmination, restraint of trade and monopoly."

As to the inserted "public interest" clause, he said (page 14930):

"This prevents the Commission from becoming a clearing house to settle the everyday quarrels of competitors, free from detriment to the public, which should be adjusted through the ordinary processes of the courts."

Mr. Stevens, also a manager and of the committee, said (page 14934):

"It [the bill] does not [do away with the Sherman law]. It is a method of enforcing it and making it more effective, and preventing its misuse."

On page 19436 he said:

" * * * With this jurisdictional qualification carefully stated in the bill, that the Commission has no authority to act unless the methods of unfair competition shall injuriously affect the public interest. That must be the basis of its action and jurisdiction. In that way the Commission will be freed from private quarrels and controversies."

The two amendments made in conference can be traced back in the record and measurably interpreted by it. In meeting the objection that "unfair competition" would mean "palming off," and nothing else, Senator Hollis, of the committee, said (page 12145):

"If * * * the words 'unfair competition' have a peculiar and limited meaning, applicable only to the substitution of one man's goods for another's, * * * it is very easy to separate the two words, 'unfair' and 'competition,' so that they will not become mixed with [that] particular sort of methods. * * * It would be very easy to make the operation of this act certain by specifying that * * * unfair methods of competition * * * are prohibited. Therefore * * * I suggest—and I hope the chairman of the committee will consider the suggestion and agree to it—that the words 'unfair' and 'competition' be separated by some word that will not do them any harm, such as 'oppressive,' or 'methods of,' so that there will not be the particular label that has been attached in many cases. * * * "

Apparently the conferees adopted this suggestion.

Commenting on and repeating the frequent assertion that the law was not intended for those acts of competition, unjustifiable as between traders, for which existing laws gave remedy, Senator Cummins, in the course of the main discussion, said (page 13151):

"The unfair competition with which the public is concerned is unfair competition which is inconsistent with or repugnant to the continuance of competition as a force in the business life of the country."

Senator McCumber said (page 13304):

"There are many practices which might be unfair as between competitors, the result of which is beneficial to the public [as, by forcing lower prices to meet it], and it only ceases to be beneficial to the public when the effect of the competition is such that it destroys one of the competitors."

It was apparently to meet this view that the conference committee made its second amendment, requiring an initial finding of public interest.

This review leads me to the conclusion with which this discussion opened, viz. that the jurisdiction of the Commission is limited to those situations indicating at least substantial tendency to restraint of trade or monopoly. There is, however, another, or second, view not without support in the record. It is that the jurisdiction extends also to cases of "palming off," if the sufficient "public interest" exists. Against this view it is to be noted that such result was foreign to the general purpose of the act, was not called for in addition to existing remedies, and was not urged in reports or debates, as well as that the words "methods of" were inserted for the seeming purpose of avoiding this meaning. For this view it is to be said that Congress chose a phrase, "unfair methods of competition," that was so analogous to the phrase, "unfair competition," which had been judicially defined as "palming off," that the courts must accept this fixed meaning as indicating one at least of the results accomplished by the law.[4] I come to this again, after considering the course of the judicial decisions.

The act passed in 1914. No case seems to have reached the courts until 1919, when, at about the same time, the Sears-Roebuck Case was decided by the Seventh C. C. A. (258 Fed. 307, 169 C. C. A. 323, 6 A. L. R. 358), and the Gratz Case by the Second C. C. A. (258 Fed. 314, 169 C. C. A. 330, 11 A. L. R. 793). The Sears-Roebuck Case was typical of the class which, in my judgment, was not intended to be brought within the act. Competitors complained that the Sears-Roebuck Company promoted the sale of its goods by advertising certain nonexistent merits; there is no suggestion, in the opinion, that the practice tended toward monopoly or restraint of competition; the court evidently assumed, perhaps for lack of any challenge, that "unfair competition" in this act would have the broadest natural meaning as in private controversies between traders—an inference in express conflict with the repeatedly declared purposes of House and Senate. The case was not reviewed by the Supreme Court.

[4] Particularly some of the discussions in the House, after the section 5 was reported by the managers, lend support to the theory that the "palming off" subject was thought to be within the power granted, when upheld by the necessary public interest.

In the Gratz Case it appeared that the unfair methods complained of did have to do with a restriction thought to be undue restraint of trade, tending to monopoly. When the case reached the Supreme Court (253 U. S. 421, 40 Sup. Ct. 572, 64 L. Ed. 993) the majority thought that the practices in question did not unlawfully restrain competition, and hence that the act was not violated. Justice Brandeis, dissenting, thought that the methods used were undue restraint, and he reviewed the origin and purposes of the Trade Commission. He makes it clear that the whole purpose of the act creating the Commission was to aid the anti-trust acts. In 1920, in the Asbestos Case (Second C. C. A.) 264 Fed. 509, 18 A. L. R. 546, it was held that for one competitor to bribe the employees of another was not an unfair method of competition, within section 5, because such practices were not a matter of public interest. Both this decision and the previous one in the Gratz Case are based upon the provision of section 5 that public interest must be involved before the Commission proceeds. The court found that there was no public interest of any kind, and so had no occasion to consider the limiting definitions repeatedly made in the House and Senate.

At about the same time the same court considered the Beechnut Case, 264 Fed. 885. This again involved a supposed restriction of competition, tending to monopoly. The court thought the facts did not make the restraint unlawful. The whole question considered was whether the methods employed would violate the Anti-Trust Act, or, as stated by the court (page 889), "is that the method is unfair, because it stifles competition and so restrains trade." Judge Manton said (page 890) that "it was intended by section 5 * * * to prevent practices or methods * * * unfair to the public which, if not prevented, would grow and create monopolies, and thus restrain trade and lessen competition." This case was reviewed by the Supreme Court and reversed. 257 U. S. 441, 42 Sup. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882. The majority of the court thought that the Beechnut methods of price restriction were within the forbidden unlawful restraint of trade, and the reversal was for this reason. Justice Day said (257 U. S. p. 453, 42 Sup. Ct. 154, 66 L. Ed. 307, 19 A. L. R. 882) that the Trade Commission Act "was intended to supplement previous anti-trust legislation." The dissent is only as to the unduly restraining character of the Beechnut methods.

Next in order came the National Harness Association Case, before this court. 268 Fed. 705. We sustained the Commission's order, but the whole complaint was that the methods attacked were part of a plan to suppress competition throughout the trade. Nothing else was involved or considered. The same situation existed in the Gasoline Pump Cases, in the Second, Sixth, and Seventh Circuits (273 Fed. 478, 17 A. L. R. 389; 274 Fed. 571; 276 Fed. 686), where the practices involved were thought not unduly restrictive, and the Commission's order was vacated. When the Supreme Court came to consider and affirm these cases, April 9, 1923 (43 Sup. Ct. 450, 67 L. Ed. ——), its whole discussion is consistent with, and indeed indicates, the idea that the unfair competition contemplated by section 5, is that which unduly restricts competition.

In Kinney-Rome Co. v. Federal Trade Commission (C. C. A. 7) 275 Fed. 665, 18 A. L. R. 542, it was held that giving a commission to the salesmen of jobbers was not unfair competition. The court, inferentially, made the same assumption as in the Sears-Roebuck Case. Other cases, not necessary to cite, have involved merchants' associations' and jobbers' practices—plainly undue restraint of trade, if unfair at all.

With an exception yet to be noted, this recital covers all the judicial decisions under this act which are found up to date. Save for the Sears-Roebuck and Guaranty Veterinary Co. Cases, they are all at least consistent with the conclusion that there is no unfair competition under section 5 unless there is a tendency to monopoly. The exception, not yet noticed, is the Winstead Hosiery Case. When this was before the Second C. C. A. (272 Fed. 957), there was no occasion to consider whether the statute went beyond undue restriction of competition, since the court concluded that the defendant's acts were not unfair. It was without doubt assumed by the court that the statute did have a broader scope, else the court never would have reached the question which it considered and decided. So far as the report indicates, the contention that section 5 reached only such unfair competition as tended to monopoly was in no way brought to the attention of the court.[5] The same thing is true as to the treatment of the case in the opinion of the Supreme Court (258 U. S. 483, 489, 42 Sup. Ct. 384, 66 L. Ed. 729), though attention was drawn in the argument to the fact that "the purpose behind the act was the regulation of competition," and reference was made to Senate Report 597. The court found that public deception was caused by the labels and—

"the facts show that it is to the interest of the public that a proceeding to stop the practice be brought; and they show also that the practice constitutes an unfair method of competition as against manufacturers of all wool knit underwear and as against those manufacturers of mixed wool and cotton underwear who brand their product truthfully."

The opinion concludes:

"As a substantial part of the public was still misled by the use of the labels which the Winstead Company employed, the public had an interest in stopping the practice as wrongful; and since the business of its trade rivals who marked their goods truthfully was necessarily affected by that practice, the Commission was justified in its conclusion that the practice constituted an unfair method of competition."

Here was a typical case of "palming off" of his goods by one dealer, not as those of another individual, but as those of another class. The case must be taken as approving, though sub silentio, what I have called the second view of the phrase "unfair methods of competition," making it include the fixed judicial definition of "unfair competition," even when there is no tendency to monopoly or undue restriction, except that remote tendency which always exists in every such case, and provided the public interest arises. If upon full consideration, that court should decide to adopt a more restricted definition, it will not be embarrassed by any contrary, unspoken, but necessary, inference

[5] The Royal Baking Powder Case (C. C. A. 2) 281 Fed. 744, is essentially like the Winstead Case.

from the Winstead Case, but all other courts are bound by those inferences.

It is also thereby decided that the public interest does exist under circumstances substantially like those there involved; but it goes no further. It cannot, as I think, intend to hold that the public interest may be found merely because a fraction of the public may be misled as to the origin or identity of merchandise advertised for sale. That kind of public interest inheres in every ordinary injunction suit for unfair competition brought by one trader against another, and the public interest clause was inserted expressly to limit the scope of the act and to exclude that kind of controversy. The Winstead Case discloses a public interest of that very unusual kind and degree which alone, as I think, can justify a proceeding by the Commission where it is not striking at incipient monopoly. The purchasing public liable to be misled comprised the whole people, and the controversy was about an article of universal use. If a mere "palming off" case, not involving a tendency to crush competition, can ever indicate a public interest sufficient to give the Commission jurisdiction, the Winstead Case does.

Not so with the present case. It interests, not the whole public, but only those on farms; not all farmers, but only those who are stock raisers; not all stock raisers, but only swine breeders; and not all swine breeders, but only those with predilections for the Chester type. I cannot believe there is any statutory public interest in establishing that the "Mammoth" hog of early Pennsylvania lived only in fable, and is mythological, not historical. Nor is there any "palming off." Defendant advertises, "My goods are better than plaintiff's, because they are different." Plaintiff says, "They are not better; they are the same thing." Complaint to a court by such a plaintiff of such competition is, I think, without precedent. Further, as the opinion of Judge DONAHUE points out, there is no restraint of competition; quite the contrary.

While I concur in that opinion, both as to reasoning and result, I would go further, and vacate entirely the first paragraph of the order to desist.