## RALADAM CO. v. FEDERAL TRADE COMMISSION.
### No. 5429.

Circuit Court of Appeals, Sixth Circuit.
July 1, 1930.

L. W. McCandless and R. T. Gust, both of Detroit, Mich. (Stevenson, Butzel, Eaman & Long, of Detroit, Mich., on the brief), for petitioner.

M. A. Morrison, of Washington, D. C. (Robt. E. Healy and Edw. J. Hornibrook, both of Washington, D. C., on the brief), for respondent.

Before DENISON and HICKS, Circuit Judges, and COCHRAN, District Judge.

DENISON, Circuit Judge.

The so-called patent medicine habit has a traditional hold upon the masses of the American people. The medical profession has always contended that auto-diagnosis, drug store purchases, and self-medication are dangerous to the public health, and ought to

be suppressed or minimized. The evil, at least in some degree, is not to be denied; but how it should be stopped has been considered an insoluble problem. This record reveals the solution. The type of advertising which has long been customary for the commercial promotion of these remedies[1] is to be scrutinized and perhaps condemned by the Federal Trade Commission; and thereupon the appropriate United States Circuit Court of Appeals is to stop it by injunction. The proprietor of the particular remedy here involved challenges the power and right of the Commission in these respects, and brings this petition for review.

For many years, and particularly of recent years, vast numbers of persons have desired to reduce their weight. Whether there was accumulation of fatty tissue beyond the normal standard for that person,—a real obesity,—or whether there was a mere desire to be more slender, the tendency went to such an extent as to become a craze or a fad. Every one knew that a diminution of food intake—diet—or an increase of muscular effort—exercise—would tend to bring reduction. These things were prescribed and controlled by doctors and institutions, and were promoted by propaganda unmeasured. More than twenty years ago scientific research developed the theory that the consumption of fatty tissue which brought weight reduction was a process of oxidization—the excess could by analogy be considered as burned in the body tissue cycle. The theory was also developed that the normal secretion of the thyroid gland was an effective agent in bringing about or accelerating this oxidization. Still later, it was found that the medicinal use, by mouth or subcutaneously, of the substance of this same gland taken from food animals would supplement and so increase the effect of the human thyroid gland. Still later it was learned—or at least came to be and still is believed by the medical profession—that the rate of such tissue consumption in a particular patient can be measured by observing the amount of oxygen used by that patient in a given period of breathing. Experiments indicate the average or normal rate, appropriate to a particular age, height, etc., and this has been named the basic metabolic rate—for short, the doctors call it the B. M. R. The use of the devices which have been ingeniously contrived for measuring this oxygen consumption by the patient, they call the metabolism test. So much for background and scenery.

Some twenty years ago, and while the underlying theory of the thyroid gland action was known rather exclusively to men of science, and was not the subject of much popular knowledge, the predecessors of the Raladam Company, which was the respondent before the Federal Trade Commission, and is the petitioner in this review, devised what they called a remedy, or treatment, for obesity. The primary active agent was a preparation of the thyroid gland of animals, either in extract or desiccated form. The remedy contained also drugs, for their collateral effect, and other substances for body, flavor, etc. They named it Marmola. Their advertising and other methods of promotion progressively varied, but, when this proceeding was commenced, petitioner and they had been, for some years, furnishing the article only for ultimate sale by the retail drug trade and not selling directly to the user. They were doing very extensive advertising, both in the so-called national magazines and periodicals and in the daily and weekly local newspapers. The result had been a very large and profitable business. Each package as sold contained a considerable number of these Marmola tablets, and upon the package and in the inclosed leaflet were directions and advice in regard to the use of the treatment. The specifically important points in this advertising and these directions will be developed later.

The Commission filed this complaint. It alleged that the Raladam Company was using unfair methods of competition, in that its advertising contained a considerable number of false statements and claims. The Raladam Company answered. Testimony was taken before a trial examiner. In accordance with the rules of the Commission, he made his report, stating conclusions of fact and of law like a master in chancery; and, also pursuant to the rules, each party filed exceptions, and the exceptions were argued before the Commission. Without reference to, or mention of, the examiner's findings or the exceptions thereto, the Commission thereupon made its findings of fact, to the effect that the advertising claims were false and injurious to the public in certain particulars, and thereupon made its order that the Raladam Company should desist and refrain in the particulars specified. Within due time the respondent before the Commission brought this petition for review, alleging that the Commission's findings were not sup-

[1] We use "remedy" in the common, though not accurate, sense as meaning an article to be used as a treatment for an ailment, and tending to relieve or cure.

ported by the evidence, and that it lacked jurisdiction for the reasons and in the particulars specified. Raladam prayed that the order to desist and refrain be vacated. The Commission filed an answer, taking issue on the petition. It then proceeded, by analogy to equity practice, to add a cross-complaint, and pray that the court enjoin the petitioner from such advertising and other conduct as the Commission had forbidden.

The petitioner has asked that this quasi cross-bill be dismissed because not authorized by any rule or by general equity practice. This motion was continued until final hearing; and we now find it unnecessary to make any ruling thereon but, for present purposes, we assume that it was rightly filed.

The Commission's order to desist and refrain contains six specific prohibitions against advertising. Taken together, they reduce to two; they forbid the representation that Marmola is a scientific remedy for obesity; and thereupon they forbid advertising Marmola as a remedy for obesity unless the statement is added that it is not safe to be taken except under the supervision of a competent physician.

Before taking up the merits, we notice a matter of practice. The record showed that the proofs were taken before a trial examiner. He acted as a master or trial judge does. He ruled upon testimony, admitting or excluding; he frequently asked questions and directed and controlled counsel; he obviously felt that responsibility was upon him for the primary decisions which would stand unless overturned; then he made his findings, which he returned to the Commission with the evidence. In making up the record for this review, the Commission did not include these findings. Petitioner insists that, since the statute contemplates rules of practice by the Commission, and since the Commission has made rules assigning these duties and functions to the trial examiners, and since the Commission does not ordinarily itself see the witnesses, such findings became a proper part of the record for review. In reply, it is said that, since the Commission's findings of fact must stand, if supported by any evidence, the development of the matter before the Commission in this particular is immaterial. There are no Circuit Court of Appeals rules on this subject. Lacking them, it has been held that such findings need not be included; and we think that exclusion is supported by the better reason, and so we deny the motion to include; but we direct that, if the record is prepared for review by the Supreme Court, this motion to bring in the examiner's findings and the findings themselves be included in that record. In the margin we give part of these findings, both to illustrate the question of practice presented and because they make a clear summary of one view of the question in dispute.[2]

The first question raised is whether the advertising representations as to the scientific character and the safety of the remedy are statements of fact or are opinions. If the latter, it is conceded that the Commission could not transform them into matters of fact, and it is said that, as they were matters of opinion, and the opinions were held in good faith and were not unreasonable, the prohibitions in the Commission's order cannot be sustained. There is, in the petition filed by the Commission, no claim that the representations as to science and safety were fraudulent and not made in good faith, or were so obviously and clearly unsound that they could not plausibly be held by any intelligent person. There being no issue as to fraud or bad faith, no proofs were taken on either side, and such suggestions as are now made with that aspect must be disregarded.

Coming to this question, "fact or opinion": It is clear that the adjectives "scientific" and "safe" have ordinarily no absolute meaning. Nothing is always entirely safe, not even water to drink; nothing is so scientific to-day that it may not be discarded to-morrow; little is so chimerical to-day that it may

[2] "Eleven physicians have testified in this cause. These men, so far as can be gathered from seeing and hearing them testify, from weighing their qualifications as given in evidence, appear all of them to be of high standing in their profession. They are all members of the American Medical Association, and of other medical associations in their respective states, and all of them appear to be acquainted with thyroid as a medicament, but there is a sharp variation in their testimony, five of them testifying that [Marmola is unscientific and unsafe]. Six of them testify [to the contrary]. With such conflict as is shown by the record, it becomes extremely difficult to determine what is the fact in connection with the statements alleged to have been made by the respondent that the Marmola Prescription Tablets are a scientific method based on long scientific research, that its medicinal properties are safe, pleasant, and effective; that said tablets may be used by purchasers thereof without discomfort, inconvenience, or danger of harmful results to the physical health of such users; that the said tablets are a scientific method for the treatment of obesity. We appear to be involved in a scientific dispute the determination of which cannot be safely or justly predicated upon the evidence contained in this record."

not be scientifically accepted to-morrow. It was long a "scientific" fact that the world was flat; travel under the sea or in the air was long a scientific impossibility; Darius Green was the archetype of credulous ignorance. These merely illustrate that whether any particular plan or theory is scientific, in a fair sense of the word, is typically and generally a matter of opinion. If sometimes it is a matter of fact, that is exceptional.

Upon observing the disputes between the doctor-witnesses as to whether this remedy may properly be dubbed scientific, it is at once seen that there is no particular conflict between them except as to the meaning of the word as here used. The witnesses for the Raladam Company refer to accepted medical theories—scientific theories, by proper definition—and to the fact, somewhat mysterious but now accepted by scientists, that the thyroid extract supplements the effect of the patient's own thyroid gland, and that this causes an increase in the metabolic rate and so increases the fat elimination. They see also that an additional burden is put upon the organs of ultimate elimination, that laxative drugs are therefore "indicated," and are found in the Marmola composition. For these and other reasons they regard it as "scientific"; and it is, we think, plain beyond dispute that, if we use a considerable breadth of definition, they are right. The witnesses for the Commission insist that no treatment for obesity—or in fact for anything else—is "scientific," and no remedy can be scientifically prescribed or be considered itself scientific, unless there is first a thorough examination of the patient, to learn his condition in all respects, lest some treatment indicated by one symptom fail to do good, or, indeed, do harm because of the patient's condition in some other respect. Particularly as to obesity, they insist that there should be a metabolism test, in order to make a scientific basis for deciding how much thyroid extract it is proper to give, or indeed, for deciding,—as far as diagnosticians do decide,—whether the obesity is due to a thyroid deficiency or to a deficiency in some other gland, or to no cause at all except eating too much. Undoubtedly, these doctors also are right, if we give to the adjective "scientific" the particular and extreme construction which they do.

Considering and contrasting these views, it seems to us quite impossible to say that the problem, whether this remedy, in the environment of these advertisements, is or is not "scientific," presents a question of fact, capable of being dogmatically fixed, in one way or the other, as disputed facts are decided. We think that it was at the beginning of the proceeding and continued to the end to be a matter of opinion; and, in final analysis, a matter of opinion as to what definition of the word was more appropriate to the circumstances.

The same conclusions prevail in the matter of "safety." The Raladam Company advertised that Marmola tablets were safe to take. It is difficult to see that the form of this representation, so long as it is merely general, is of much importance. Within wide limits, there would be an implied assurance of safety in taking any food or drug placed on the general market; but the assurance, whether expressed or implied, would always need construction and could mean only,—while kept in general terms,—that if it were used reasonably, or in accordance with instructions, it would be reasonably safe. To illustrate: Much is said in the testimony and the proofs about the toxic or poisonous quality of thyroid extract. There is no reason to doubt that it could be given in such quantity, or in the presence of such conditions of bodily disease, that the effect would be very deleterious, whether "toxic" or not; but it is equally clear, and is admitted by the Commission's counsel, that there is no drug or active agent in the entire bounds of materia medica which is not, by the same definition, poisonous.[3] No active drug is known which will not produce very dangerous results if taken in extreme quantity, or under certain abnormal conditions. It is, we think, apparent beyond dispute from this record that, if these Marmola tablets were to be taken at such a rate that the patient would get half a grain of thyroid per day, there would be no serious contention that there would usually be any substantial danger or any lack of ordinary safety; while if the quantity of extract to be administered were 20 grains a day, there would be no denial that a substantial degree of danger was commonly created. The quantity taken, therefore, must be the vital thing upon which the doctors base their opinion as to danger. The commonly accepted standard as to the whole subject of materia medica is the United States Pharmacopœia, which, in its current edition, expresses what is thought to be the current professional view. It defines the various drugs and their medi-

[3] It "may be described as a deadly poison or as a valuable item of the pharmacopœia according to the rhetorical purposes in view." Mr. Justice Holmes in Coca-Cola Co. v. Koke Co., 254 U. S. at page 145, 41 S. Ct. 113, 65 L. Ed. 189.

cinal effects and states a dosage, which is understood to be the ordinary or average dose for adults where the drug is "indicated." The stated dosage contemplates repetition to get three or four doses a day. The dosage given for thyroid extract was, in the earlier editions, 4 grains, and in a later edition 2 grains, and in the current edition 1 grain, thus now contemplating a daily dosage of 3 to 4 grains. Each Marmola tablet contains one-half grain, and the directions are to take 3 or 4 per day. The patient, therefore, receives $1\frac{1}{2}$ or 2 grains per day, and the treatment is directed to continue for 60 days, unless, within that time, sufficient reduction should occur or unless unusual conditions develop. In the latter instance, the user is directed to consult a physician. The specific question, therefore, is whether this amount of thyroid taken in this way is so inherently and characteristically dangerous to the patient as to make that danger a fact, as distinguished from a debatable opinion.

It seems to us that the Commission has itself decided this question upon the theory of opinion rather than of fact, when it has found that it is all right for the public to take Marmola if the taking is under the supervision of a physician. This necessarily means that there is no inherent or certain danger, but that the professional opinion of the physician, as to whether administration or continuance is wise, ought to be always at hand.

The nature of the controversy is further indicated by the nature of the supposed danger and the professionally advised precautions. Obesity is very commonly the result, at least in part, of hypo-thyroidism. Of such a case the doctors say that the patient has a minus B. M. R. of 20 or 40, or whatever the rate may be. To such a patient they would properly give thyroid extract until he reached at least the normal B. M. R.; but they say that, if the patient has a rate well above normal metabolism,—hyperthyroidism, —giving this remedy will increase the hyperthyroidism, and that may bring bad results. No one disputes this, but the first answer,—as bearing upon general, typical danger,—is first, that people who have hyperthyroidism, or tuberculosis or any other specified disease where thyroid extract would be contra indicated—are not usually looking for obesity remedies; they are already too thin; the advertisement is not to or for them. The second is, that the results produced by too much thyroid are those which are generally called nervousness, including overtension, loss of sleep, etc. Whenever these unusual conditions develop, the directions are to stop the treatment and consult a physician. An unknown fraction of those in whom these symptoms develop might persist in the treatment with the result of aggravating the symptoms; but, even then, it would be pointed out that the harmful results might be due to the starvation diet or the excessive exercise which these reducers were tempted to employ. Any study of the evidence, however casual or however thorough, leads to and compels the conclusion that the whole subject of "safety" stands upon the same basis as that of "science." The Commission's witnesses believe that this extract should not be given to a patient until after a metabolism test to make sure (or rather to make probable) that the patient has a thyroid deficiency rather than an excess. Equally important, they think, is a complete examination to indicate that there is no heart lesion or kidney disease or other serious condition; for if there is, there should be consideration as to the advisability of stimulating the thyroid action,—it might or might not be wise. These same witnesses frankly agree that they have the same view about all other active drugs or agents. They think that such things do harm sometimes, and hence that none should ever be administered excepting after a professional study of the case,—as one doctor frankly put it, "as thorough an examination as the patient can pay for." All this merely comes to saying that they think the drug store sale of Marmola is unsafe because they think no active drug or agent should be by the public self-prescribed or self-administered. The same conclusion, if from a strict standpoint, is inevitable as to numerous so-called standard remedies sold over the counter to everyone who wants them; not one of them is, according to the standard of safety thus advocated, safe for popular use and consumption. Very likely every member of this court will personally fully agree with this professional opinion that such public self-medication is unwise; and then go out and buy quinine or aspirin, or anything else that he is told will help his particular ailment.

These various considerations merely confirm what to us is clear, even upon first glance, that whether it is "safe" for the public to buy and take Marmola according to instructions is not a matter of fact. It is a matter of expert opinion, as to which there are as many shades and degrees as there are experts who discuss it, and as to which a non-

35

expert Board can hardly have been intended to be umpire. We concede, of course, that questions of fact must often be decided upon conflicting opinion or expert evidence; and that, too, by a tribunal of laymen; but questions so to be decided admit of categorical answer; scientific (?) and safe (?) do not.

Three Supreme Court cases are urged upon us, as controlling or important, and they should have attention. We think no one of them has anything like the scope here claimed for it. In the McAnnulty Case, 187 U. S. 94, 23 S. Ct. 33, 47 L. Ed. 90, there is a discussion as to the difference between fact and opinion, and it was held that, for the purposes of that case, the falsity of an opinion was not sufficient. There, however, the criterion was fraud; and there was no showing that the speaker did not honestly hold the opinion which he stated, and, the thing not being impossible on its face, fraud was not made out. In Seven Cases v. U. S., 239 U. S. 510, 36 S. Ct. 190, 60 L. Ed. 411, L. R. A. 1916D, 164, and Leach v. Carlisle, 258 U. S. 138, 42 S. Ct. 227, 66 L. Ed. 511, the question also was one of fraud. The holdings were merely in complement to the McAnnulty Case, that, if an opinion was not, in truth, held, or if it was of such character that it could not be honestly held by the speaker, the charge of fraud might be maintained, although the expression was only one of opinion. We cannot see in these cases any particular bearing on the question here.

Argument is made and cases cited to the effect that, when a claim or statement of therapeutic value is shown to be false, the mere belief by the utterer in its truth will not protect the statement against suppression, nor necessarily protect the utterer against punishment. Such cases are wide of the mark. If, in the present case, the petitioner had claimed that Marmola would tend to reduce fat, and this claim had been proved untrue—even though the proof were only from a fair concensus of expert opinion— it would not be important, for some purposes, that the petitioner believed the claim to be true. We have nothing of that kind here. There is no denial of the therapeutic effect of Marmola as a treatment for obesity. Thyroid furnishes the recognized treatment, approved by all physicians; the complaint is not that Marmola has no therapeutic effect, but that it may have too much; and we come directly back to the question whether we may say, not as expressing an opinion but as stating a fact, that it is neither scientific nor safe to advertise and sell Marmola as an ef-

fective remedy to be taken without medical supervision; and we come again to the conclusion that this is a matter of expert opinion, determined by the particular expert's conceptions of science and of safety.

Before leaving the subject of "safety," it should be pointed out that there is no finding, nor any evidence, that any substantial part, or any particular part, of that public to which these statements are addressed— the obese public, the average or usual or ordinary obese person,—would be reasonably likely to be harmed by the advised use of these tablets. The fair inference is that the actual harm would be occasional and rather exceptional. There is only the chance that the user may be of the exceptional class; upon that contingent basis rests the finding of general danger.

Another contention should be noticed: Petitioner says to the public—whether the statement happens to be in a printed form or orally,—that this remedy is safe to be taken according to directions by the average person; the Commission orders that the petitioner shall not make this statement unless modified in form to suit the Commission; that is, unless accompanied by the statement that it is safe only when medically supervised. Thereupon, the court, acting as a court of equity, is asked to enjoin the publication. Petitioner contends that such injunction would be a violation of the first amendment, and that its constitutional right to freedom of speech prevents such suppression. This contention is forcefully made; but we find it unnecessary to pass upon it.

A broader question of the jurisdiction of the Commission underlies. In the Silver Case (C. C. A.) 289 F. 985, page 992, one member of the court took occasion to study the history of the creation and purposes of the Federal Trade Commission. The conclusion was reached that the Commission came into being as an aid to the enforcement of the general governmental anti-trust and anti-monopoly policy, and that its lawful jurisdiction did not go beyond the limits of fair relationship to that policy. Since that opinion, there has been no decision of the Supreme Court inconsistent therewith, nor any Circuit Court of Appeals decision which expressly denies that theory.[4] Doubtless there

---

[4] Counsel cite the comment which the Supreme Court, in its opinion in Federal Trade Commission v. Klesner, 280 U. S. 19, 26, 27, 50 S. Ct. 1, 74 L. Ed. 138, made upon the Beech-Nut Case, 257 U. S. 441, 42 S. Ct. 150, 66 L. Ed. 307, 19 A. L. R. 882, and the Winsted Case, 258

have been opinions from these latter courts which are more or less inconsistent with its full acceptance;[5] but the accuracy of the historical study then made has never, so far as we know, been particularly challenged, either by judicial opinion or in the periodical literature of the law. This court, as now constituted, is prepared to and does adopt the general view there stated, as to the foundation of the Commission's jurisdiction. See, also, our opinion in Berkey & Gay v. Fed. Trade Commission, 42 F.(2d) 427, this day filed.

---

U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729. The comment is that in neither case did the private right of any competing trader appear to have been invaded. As we noted in our opinion in the Toledo Pipe-Threading Co. Case, 11 F.(2d) 337, 343, the Beech-Nut Case needed no evidence of unfair competition with any one. The practice involved and condemned was the price restriction policy. This had been expressly found illegal under the Anti-Trust Act (Miles Medical Co. Case, 220 U. S. 373, 31 S. Ct. 376, 55 L. Ed. 502), and expressly declared illegal by the Clayton Act. The whole ground of illegality of price restriction is that it restrains competition between trade competitors. To have considered this ground in making application to the Beech-Nut Case, would have been supererogation. The opinion in the Winsted Case expressly declares (page 493 of 258 U. S., 42 S. Ct. 384, 385): "The practice constitutes an unfair method of competition as against manufacturers of all wool knit underwear and as against those manufacturers of mixed wool and cotton underwear who brand their product truthfully. For when misbranded goods attract customers by means of the fraud which they perpetrate, trade is diverted from the producer of truthfully marked goods." And again (page 494 of 258 U. S., 42 S. Ct. 384, 386), after finding that the public had an interest in stopping the practice as wrongful: "And since the business of its trade rivals who marked their goods truthfully was necessarily affected by that practice, the Commission was justified," etc. It seems quite clear that the Klesner Opinion in making reference to the Beech-Nut Case and the Winsted Case as not involving invasion of the private right of any trader competed against intended to put the emphasis upon the right of a *private or individual* complaining competitor; and is not inconsistent with the necessity of injury to the class of "honest manufacturers" who were named and directly protected in the Winsted Case, and who were in the background in the Beech-Nut Case.

[5] We do not so regard Proctor & Gamble Co. v. Federal Trade Commission (C. C. A. 6) 11 F. (2d) 47. The direct and large-scale competition between petitioner's Naphtha soap and the brand of soap long on the market under that descriptive name was unquestioned.

The thing forbidden by the statute is *unfair* competition. This cannot exist unless there is competition, and there cannot be competition unless there is something to compete with. It must be evident that the trade which was to be protected against restraint (and unfair competition is a kind of restraint) was that legitimate trade which was entitled to hold its own in the trade field without embarrassment from unfair competition. The first thought might be that the one invoking protection should be a particular trader; but the Winsted Case, 258 U. S. 483, 42 S. Ct. 384, 66 L. Ed. 729, teaches that protection will also be given under this statute to the entire class of trade which is having its former customers taken away from it by false representations that the competing goods are of the same descriptive qualities as those put out by the complaining class. It is apparent from this record, as well as from other recent or pending cases in this court and other decisions of the Commission and from announcemenats by its members shown in this record,—that the Commission does not take this limited view of its jurisdiction, but that it believes itself authorized to issue its "desist and refrain" orders in any case where it concludes that sales methods may mislead a substantial part of the purchasing public, in a way and to an extent that, in the judgment of the Commission, is injurious to the purchaser. The general law of unfair competition uses the misleading of the ultimate retail purchaser as *evidence* of the primarily vital fact, injury to the lawful dealer; the Commission uses this ultimate, presumed injury to the final user as *itself* the vital fact. The result is a realization of what was suggested in the former opinion as to the opened vista (Silver Case [C. C. A.] 289 F. 992, 993) and a pro tanto censorship by the Commission of all advertising. This particular case relates to medicine advertising, and of a class doubtless disapproved by the "best people"—who can afford to employ good doctors; but that disapproval cannot create jurisdiction. The record here shows, without dispute, or by implication which would hardly be denied, that the American Medical Association is engaged in a campaign against those proprietary remedies which it believes ought to be used by the public either not at all or only under supervision. It has a Bureau for that and other purposes, and the Bureau employs a director. When it is thought that a particular advertisement should be stopped, this director takes the matter up with the Commission and with the association of "Better Business Bureaus," which are scattered over

the country. Thereupon the Commission, if it approves, files a complaint, and eventually, if it is convinced of the truth of its complaint, makes the order to desist and refrain. The Better Business Bureaus explain to their local newspapers and to the general periodicals that it would be wise to refuse this advertising. The chairman of the Commission, in public addresses, and in correspondence, advises the newspapers that they will be subject to prosecution by the Commission as defendants, to be joined with the advertisers, if they do not desist from such publications; and the newspapers may suspect that, if they do not comply with the advice of the Better Business Bureaus, their general advertising patronage from the membership of these bureaus will fall off. It appears that these methods of influence, carried on in this case before this cross-suit for enforcement was commenced, and while it has been pending, have destroyed a large part of petitioner's business through refusals to accept this advertising, and only the injunction of this court is needed to make the elimination complete. We have no occasion to deny nor, indeed, reason to doubt, that this elimination would tend to the public good; but we cannot think that Congress had any conception that it was creating a tribunal for that kind of action. Its failure for many sessions to pass a proposed "pure fabric" law, and others of similar character, is familiar; but if the Commission's view of its own jurisdiction is right, these laws are unnecessary.

When we search this record to find the legitimate activities which are to be protected against this unfair competition, we observe only two such possible beneficiaries. One is the medical profession. It cannot be seriously contended that the act was intended to protect any profession against encroachment—the aid of the Commission might be as logically given to physicians and surgeons as against chiropractors, or to lawyers as against incompetent will draftsmen.

The other possible beneficiary is found in the list which the American Medical Association Bureau has made up, comprising a number of other commercially exploited remedies for obesity, which have been advertised or found in the drug stores within recent years. Some of them are perhaps still being sold in substantial quantities, though that is left very vague. It is fairly to be inferred, not only that these are on the same index expurgatorius as Marmola, but

that they are relatively disreputable.[6] Again, it cannot be seriously contended that the machinery of the Commission was intended to give governmental aid to the protection of this kind of trade and commerce.

We conclude, therefore, that the record does not show any basis for the action of the Commission. The prayer of the petition will be granted and that of the cross-bill denied.

---

[6] A question intended to develop this positively, rather than to leave it inferential, was ruled out by the examiner. This was error, but the situation is too plain to require reference for further proofs.