## UNITED STATES v. 23⁷⁄₁₂ DOZEN BOTTLES, 35–CENT SIZE, AND 12⅜ DOZEN BOTTLES, 70–CENT SIZE, OF AN ARTICLE OF DRUGS LABELED IN PART "LEE'S SAVE THE BABY."

### No. 3331.

District Court, D. Connecticut.

Oct. 17, 1930.

John Buckley, U. S. Atty., and George H. Cohen, Asst. U. S. Atty., both of Hartford, Conn., and Elton L. Marshall, Sol. of United States Department of Agriculture, and John F. Morse, Asst. to the Solicitor, both of Washington, D. C., for libelant.

Ransom H. Gillett, of Albany, N. Y. (Raymond E. Hackett, of Stamford, Conn., of counsel), for claimant.

832

THOMAS, District Judge.

This is a proceeding in rem against a certain drug preparation known as "Lee's Save the Baby," which name is and has been registered in the United States Patent Office for many years. The United States filed its libel for condemnation against certain bottles and their contents, shipped in interstate commerce, and prayed that the same be condemned upon the ground that they were misbranded within the meaning of the Food and Drug Act of June 30, 1906, § 8 (34 Stat. 768), as amended by the Act of August 23, 1912 (37 Stat. 416), 21 USCA §§ 9, 10.

The libel charges that:

"Said article of drugs * * * is and was * * * misbranded within the meaning of the Act, * * * in that the following statements regarding the curative and therapeutic effect of the said article are false and fraudulent."

"(Front bottle label): 'Save the Baby'

"(Back bottle label): 'For Croup apply with the hand or by saturating * * * cloth and laying it over the throat and chest; also apply over the nose. In severe cases, where relief does not follow in half an hour, give a half teaspoonful internally every half hour. * * * For Sore Throat apply on the throat; also take one-half a teaspoonful internally. For coughs * * * apply on the chest, also take one teaspoonful morning and night. For ague in breast, apply to the parts affected. * * * '"

"(Carton) (Small): '* * * Save the Baby * * * Croup Mixture * * * For Croup, * * * Coughs and Sore Throat * * * used in cases of Grippe, Bronchitis, Laryngitis, Tonsilitis, Pneumonia, etc. * * * '

"(Carton) (Large): '* *' * Save the Baby For Croup, Coughs, * * * etc. * * * '

"(Circular): 'Save the Baby * * * for Croup * * * Coughs, Tonsilitis, Bronchitis, Sore Throat and similar ailments. * * * What Mother or Father has not been alarmed when awakened in the night by the childish cry of pain and the dread sound of croup? Or who of us has not shuddered when whooping cough, pneumonia or a hard cold has racked our children with pain and coughing spasms. It was because of a child's suffering that "Save the Baby" came into being * * * a wee girl lay seriously sick with croup * * * he administered a remedy of his own compounding * * * found * * * child completely out of danger. This physician prescribed the remedy * * * in other cases, always with gratifying results. * * * "Save the Baby," * * * by that name it had come to be known. * * * "Save the Baby" for use in * * * croup, tonsilitis, bronchitis, sore throat and all similar ailments in children and adults. * * * Use It. * * * The results will be beneficial. For Adults—"Save the Baby" works * * * with as good results for adults as it does for children. The * * * relief given in coughs, bronchitis, pneumonia and other congested conditions of the head, throat or lungs * * * "Save the Baby" * * * effective when used Hot. For Croup: * * * In severe cases, where relief does not follow in half an hour, give a half teaspoonful internally every half hour. * * * For Coughs. * * * Apply on chest and throat; also take one teaspoonful morning and night. Influenza, Grippe and Pneumonia: * * * use "Save the Baby" * * * In severe cases give a half teaspoonful internally every half hour. * * * Use "Save the Baby" * * * For Sore Throat and Tonsilitis: Apply on the throat and along the cord that runs from behind the ear down the neck; also take one half teaspoonful internally. Take from one half to one teaspoonful internally for all chest congestions and gathering of phlegm * * * '

"—in this, that the article contains no ingredient or combination of ingredients capable of producing the effects claimed, and that the same were applied to the said article knowingly and in reckless and wanton disregard of their truth or falsity, so as to represent falsely and fraudulently to the purchasers thereof, and create in the minds of the purchasers thereof, the impression and belief, that the article was, in whole or in part, composed of, or contained ingredients or medicinal agents effective in the diseases and conditions named therein."

The jurisdictional allegations as well as the shipment in interstate commerce are admitted, but the essential and last-quoted allegations of the libel as to the product are denied. Certain stipulations were filed eliminating the necessity of proving certain facts as to which it is unnecessary to make reference except as to the ingredients of the product. One of the stipulations sets forth that an analysis was made by an analyst of the United States Department of Agriculture of a sample of the shipment seized in these pro-

ceedings which shows that the composition and ingredients of the preparation are:

"Lard approximately 70%
"Alcohol approximately 6%
"Canada Balsam approximately 10%
"Volatile Oils, including
"Camphor, Rosemary Oil and
"Origanum Oil, approximately 15%"

To establish the fact that this preparation is misbranded within the meaning of the Food and Drug Act, the government must prove by a preponderance of the evidence: First, that the label, carton, or circular carries some statement, design, or device regarding the contents of the package or the ingredients in the mixture which is false and misleading in some particular; and, second, that the statement made or the design or device carried on the label or carton or in the circular regarding the curative or therapeutic effects of the same are false and fraudulent. Such being the case, the fraud alleged must be established by competent proof and by credible and convincing evidence.

The sections of the act (21 USCA §§ 9, 10) here applicable provide as follows:

"§ 9. Misbranded; meaning and application. The term 'misbranded,' * * * shall apply to all drugs, * * * the package or label of which shall bear any statement, design, or device regarding such article, or the ingredients or substances contained therein which shall be false or misleading in any particular,"

"§ 10. * * * An article shall be deemed to be misbranded. * * *

"In case of drugs:

"Imitation or use of name of other article.—

"First. * * * Removal and substitution of contents of package, or failure to state on label quantity or proportion of narcotics therein.—Second. * * * False statement of curative or therapeutic effect.—Third. If its package or label shall bear or contain any statement, design, or device regarding the curative or therapeutic effect of such article or any of the ingredients or substances contained therein, which is false and fraudulent."

It appears that the government contends that this product contains no ingredients or combination of ingredients capable of producing the effects claimed for it, and that the claims that are made for it are false and fraudulent and were applied by the manufacturers knowingly and in disregard of their truth or falsity, so as to falsely and fraudu-

lently represent to the purchasers and create in their minds the impression and belief that the article was in whole or in part composed of or contained ingredients effective in the diseases mentioned in the carton and circular.

The claimant denies misbranding within the purview of the Food and Drug Act, and particularly denies that the statements regarding the curative and therapeutic effects of this product are false and fraudulent or were made in wanton disregard of their truth. It then affirmatively alleges that this product is capable of producing and has actually produced the curative or therapeutic effects claimed for it, and has offered credible evidence in support of his contentions.

From the quoted allegations of the libel it appears that certain words and directions contained in the circular were omitted from the libel. Under familiar rules of pleading and evidence, the government is precluded from complaining of the omitted words; but it is only fair, in order to reach a proper conclusion respecting the issues presented, that we consider the entire label and all that is contained in the so-called literature and directions which accompany the bottle as bearing upon the good faith of the manufacturer of the product, because if it appears from all the evidence and I conclude that the claims made for this remedy are true, then it necessarily follows that they cannot be false or fraudulent.

In the use of the words "therapeutic" and "curative," as set forth in the statute, it seems clear that these words were intended by the Congress to be given their ordinarily accepted meaning, and while they have a certain meaning to the expert doctor, nevertheless they are a part of the vocabulary of any intelligent person. Therapeutic to the medical world means to heal; to make well; to restore to health. It is that branch of medicine dealing with the proper use of the right medicines in the treatment of diseases. The medical student studies "Therapeutics" for the purpose of learning about different medicines to prescribe for the many ills to which the flesh is heir, in order to assist nature to make a sick patient well. The ordinary definitions found in the dictionaries are as follows: "Having healing qualities; curative; alleviative; a medicine efficacious in curing or alleviating disease." Webster defines therapeutics as "that part of medical science which treats of the discovery and application of remedies for diseases." The word "curative" is not found in the medical dictionaries. The

regular dictionaries define the word as "possessing power or tending to cure; relating to the cure of disease; relating to or employed in the cure of disease; tending to cure." In none of the definitions is there a suggestion that the words "therapeutic" or "curative" convey the meaning of absolute cure. The testimony of the experts shows that a therapeutic or curative agent is something which alleviates or tends to cure a disease, and that, except in a few instances, there is no medicine which, of itself, is an absolute cure for disease.

With these definitions in mind, we turn to section 6 of the act (21 USCA § 7), which defines "drug" as follows:

"The term 'drug,' as used in * * * this title, shall include all medicines and preparations recognized in the United States Pharmacopoeia or National Formulary for internal or external use, and any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of * * * man. * * *"

Therefore, "Lee's Save the Baby" is a drug within the provisions of the statute, which is intended by its manufacturers for use in the "cure, mitigation or prevention of diseases in man."

Before analyzing the testimony, it is important to note what the Supreme Court has held as to what are and what are not false and fraudulent statements within the purview of the act. In Seven Cases v. United States, 239 U. S. 510, 517, 36 S. Ct. 190, 193, 60 L. Ed. 411, L. R. A. 1916D, 164, Mr. Justice Hughes said:

"Congress deliberately excluded the field where there are honest differences of opinion between schools and practitioners. Cong. Rec. 62d Cong. 2d Sess. Vol. 48, part 12, Appx. p. 675. It was, plainly, to leave no doubt upon this point that the words 'false and fraudulent' were used. This phrase must be taken with its accepted legal meaning, and thus it must be found that the statement contained in the package was put there to accompany the goods with actual intent to deceive,—an intent which may be derived from the facts and circumstances, but which must be established. Id. 676. That false and fraudulent representations may be made with respect to the curative effect of substances is obvious. * * * It cannot be said, for example, that one who should put inert matter or a worthless composition in the channels of trade, labeled or described in an accompanying circular as a cure for dis-

ease, when he knows it is not, is beyond the reach of the lawmaking power. Congress recognized that there was a wide field in which assertions as to curative effect are in no sense honest expressions of opinion, but constitute absolute falsehoods, and in the nature of the case can be deemed to have been made only with fraudulent purpose."

In the light of this decision it seems clear that if a drug mixture contains certain ingredients which the evidence shows have a therapeutic or curative value in the treatment of the diseases for which it is recommended, then there is no misbranding within the purview of the statute.

Before beginning an examination of the evidence, it is important to note that one of the claims made and the arguments advanced by counsel for the government, both in their opening statement at the trial and subsequently in their brief, are predicated upon a wrong premise. The argument was advanced as the result of some oversight. If by mistake, it only shows that the preparation of the case was not careful, and the argument set forth in the brief was advanced only after a cursory examination of the evidence and the carton which is in evidence, the wording of which formed part of the basis for the libel. Attention is now directed to what is actually and fully printed in the literature accompanying each bottle.

On the face of the carton we find the words, "Lee's Save the Baby contains 8 per cent. Alcohol U. S. P." On the back of it are the words: "Lee's Save the Baby. An Invaluable Croup Mixture Made Of Pure Simple Ingredients. Can Be Used Internally Or Externally. Use it Hot." On one side we find the words: "For Croup, Snuffles, Colds, Coughs and Sore Throat. Frequently Used In Cases Of Grippe, Bronchitis, Laryngitis, Tonsilitis, Pneumonia, Etc. Absolutely Safe For Children And Adults." While the word *invaluable* was left out of the libel the record shows that counsel for the government, in his opening statement as to what he expected to prove said, inter alia:

"The rear label again has the word or the name, 'Lee's Save The Baby' and a pictorial design of a woman holding a baby and following are the words; an *infallible* croup mixture," etc.

In their brief, on page 3, counsel again quote as follows: "Rear panel: an *infallible* croup mixture." Further on, in urging the argument, they say:

"The sense of the entire labeling 'sounds' the curative idea and is augmented by the use of such terms as 'infallible,' 'miraculous,' 'remedy,' etc., which are to be found in the general language of the circular."

The label shows clearly that the word used by the proprietors is *invaluable* and not, as government counsel assert, *infallible*. Invaluable means of great value, very useful, inestimable; and the testimony of the experts leads to no other conclusion than that this mixture is "an invaluable croup mixture." Infallible, as defined by Webster, means indubitable, sure, certain, not capable of erring, entirely exempt from liability to mistake. If that word was used in the literature, the government's argument on this point would be sound; but, as pointed out, invaluable is the word actually used and there is nothing synonymous about the two words.

The testimony is conclusive that thyme, Canada balsam, commonly known as turpentine, camphor, and lard used hot, are comforting and beneficial and that they alleviate the pain and the suffering incidental to the diseases mentioned, and that these ingredients do have therapeutic and curative properties which aid nature in overcoming the disease. While it is true that the act was intended to protect the public from deception and fraud in connection with the sale of proprietary medicines, and while it is true that when a preparation is put upon the market which it is claimed has therapeutic and curative value it is equally true that it must appear from the evidence that the product has some beneficial action upon the disease mentioned. The great weight of the testimony of the medical experts shows that each one of the ingredients in this mixture exerts some beneficial influence upon each one of the diseases specified.

It is generally known, and the evidence shows, that with very few exceptions there is no known "cure," using that word strictly, for any disease. Nature, supplemented and aided by proper medicines, careful nursing, and proper diet, does the work of curing. It has been clearly established that camphor, thyme, Canada balsam in a base of lard, are remedial agents of value in the treatment of croup, coughs, colds, snuffles, sore throat, tonsilitis, bronchitis, and pneumonia, and are used by reputable physicians in the treatment of these diseases. All the experts testify and the counsel for the government concede "that 'Save the Baby,' when applied externally acts as a rubefacient or counter-irritant, bringing an increased blood supply to the particular area of application, thereby soothing the patient and making him feel more comfortable; and that a further soothing effect,—a symptomatic relief is produced by the inhalation of camphor fumes given off by the preparation; that when taken internally it acts as a carminative, giving a feeling of warmth and well being to the stomach, and the camphor present acts as a slight cardiac stimulant."

The labels, cartons, and circulars in evidence recommend the use of this compound in the treatment of diseases of the respiratory system, indicate how it is to be used, and assert that its use has been found beneficial. Nowhere is there any claim made that it will cure. There is no language anywhere which could possibly be understood to convey the idea that it will cure. And what to my mind completely refutes the government's claim of fraud and falsity is the language used by the manufacturer which is directory to the person disposed to use the remedy and is found in that part of the circular headed "Directions for Use." After giving directions as to its use in cases of croup, snuffles, coughs, and colds it says: "Influenza, Grippe and Pneumonia For these serious illnesses it is wise to call a doctor soon as possible. Pending his arrival use 'Save the Baby,'" and then follows the directions as to the use of the remedy pending the doctor's arrival. Also the words, "Keep a bottle of 'Lee's Save the Baby' handy for Emergencies."

The proof in this case shows that this compound is beneficial and has therapeutic and curative value in cases of croup, coughs, colds, and snuffles. On direct examination one of the medical experts for the libelant testified as follows:

"Q. Prior to being asked to appear as a witness in this case, have you ever heard of the preparation known as 'Lee's Save The Baby'? A. I have.

"Q. Did you ever administer it to a child that you have been called upon to treat? A. I have been asked by mothers whether I would give them permission to use it and I have consented.

"Q. Do you know in a general way or specifically, the constituent ingredients of 'Lee's Save The Baby'? A. I do.

"Q. Do you have any objection to the use of 'Lee's Save The Baby' in your own mind? A. No.

"Q. Are preparations containing camphor, Canada balsam and volatile oils on a greasy base used by physicians in the treat-

ment of pathological conditions of the respiratory system? A. They are used in the treatment as a soothing treatment, not as a curative treatment."

█ In other words, conceded as it is by all that there is no cure for these respiratory diseases, the best the doctors can do to restore normal health is to aid nature with nursing, diet, and medication, because it is nature that effects the cure. If the above-mentioned medicines are those, or some of those, used by doctors in the treatment of respiratory diseases, and they are the same ingredients as are found in the product under discussion, how can it fairly be asserted that there is anything false or fraudulent in the statements made by the manufacturer as appears in the labels, cartons, and circulars in evidence in this case? If a government expert medical witness treating children with the aforementioned diseases allows mothers to use the remedy, knowing the ingredients, and has no objection in his own mind to the use of this product and testifies that camphor, Canada balsam, and volatile oils on a greasy base are used by him and other physicians in the treatment of these diseases, I conclude that the government has utterly failed to sustain the allegations of its libel.

As further enlightening, let us turn to the testimony of one of the doctors who testified in behalf of the claimant and one who has had thirty years' experience as a specialist in children's diseases and an expert of learning and long experience in the treatment of the diseases under discussion. From his testimony it appears that practically all of the ingredients in this compound appear in the United States Pharmacopoeia and that camphor has a substantial standing in Materia Medica and is used quite universally; that balsam and thyme oil are used quite commonly in the treatment of the diseases of the respiratory tract; and that camphor is one of our very valuable therapeutic agents. With reference to the value of camphor it appears from the evidence that its action both internally and externally is beneficial. Externally it is rubefacient and produces, when applied to the skin, congestion, redness, and is like a counter-irritant bringing the blood to the surface and gives relief from pain as it has the effect of an anesthetic and such is the recognized action of the drug. Internally, it is used as a stimulant for the heart and it is also used a great deal in nose syringes with a base of mineral oil which gives relief. When used externally according to the directions, i. e., put on hot, the volatile part of thyme oil, camphor, and turpentine are inhaled and this action soothes the mucous membrane of the throat and nose. It is difficult to reach the mucous membrane of the larynx when the symptom of cold or croup originates but by inhaling the volatile oils that are accumulated from the external application of this remedy congestion and irritation are relieved and the patient derives a benefit.

After dividing croup into two classes, true and false, we find that cases of true membraneous croup are now rare because of the introduction of anti-toxin, so that false croup is a common complaint among children, and the evidence abundantly justifies the conclusion that the compound complained of is in use by doctors, and in the case of one doctor of wide experience and learning who testified here that it is used in his own household.

Dr. Shaw for the claimant, a witness of extended experience in the treatment of children's diseases, testified as follows:

"Q. Now, I have the impression from the Government witnesses that there was some distinction, some distinction in the professional vocabulary between the cure so-called, the specific for a disease and the things that alleviated the thing, and tended to recover from it; has this compound here any therapeutic property which would be of value in cases of false croup? A. Yes, sir.

"Q. What are they? A. The camphor, the turpentine, the hot application of the lard, which is very penetrating, the fumes that come from it.

"Q. Have you ever seen or heard of this being used as an emetic in case of false croup? A. I have.

"Q. What was the reaction there? A. The child would promptly vomit after two or three doses of an internal dose.

"Q. And that would be the combination of hot lard and thyme oil and the turpentine, and all that? A. Yes.

"Q. And that vomit tends to bring that gathering or phlegm from around the throat? A. It relaxes the muscular spasm.

"Q. And then the croup is over? A. Yes.

"Q. About the use of this in snuffles in small children, it is recommended for snuffles, I think that is one of the words that are on there. Have you ever had any experience with the product in that way? A. I never have, although I prescribe a preparation that contains a little menthol and camphor and a

little iodine for the inhalation in the nose. It is something I have used for years and years.

"Q. And camphor, for instance, rubbed on has a certain therapeutic value for the treatment of colds in the head? A. Yes.

"Q. Not only from the fumes that it gives, but the direct action of the drug on the membrane; is not that true? A. Yes, sir.

"Q. And thyme oil and some combinations of turpentine products are recognized in the United States Pharmacopoeia, are they not, as therapeutic agents for whooping cough? A. Yes, sir.

"Q. Also for the common cold? A. Yes, sir.

"Q. Taking up the question of pneumonia, pneumonia appears on that. What do you say as to the value of this particular product in the treatment of pneumonia, in the kind of pneumonia 1, 2, 3 and 4? A. I will answer that negatively. It can do absolutely no harm; it is a self-limiting disease.

"Q. And it would not do any harm to put a hot pack on the chest? A. No.

"Q. And that tends to relieve the patient's suffering; is that true? A. If there is pain, and pleurisy is associated with pneumonia, the use of the counter-irritants, such as mustard or turpentine applied externally, produces this redness of the skin that is spoken of, and that does give decided relief.

"Q. Of course, if you can relieve the painful symptoms, you are helping the patient to fight the disease, are you not? A. Yes, sir.

"Q. Influenza and grippe are two of the claims here. Does anybody know what influenza is? A. I do not.

"Q. Does anybody know what grippe is? A. I do not.

"Q. But in cases of influenza and grippe, would the turpentine products, Canada balsam, for instance, would that have a tendency to relieve the congested condition of the lungs or the throat or the nose, as the case may be? A. I believe it would.

"Q. Would you call that a therapeutic action or a mechanical action? A. Therapeutic.

"Q. You think it would be therapeutic? A. Yes.

"Q. What do you say in that regard as to camphor, in those diseases; has that any therapeutic value on the painful symptoms which accompany what we call influenza and grippe? A. It would.

"Q. Am I right in saying that when I say a thing has a therapeutic value, it means that it relieves some present inward condition? A. Or symptom, yes.

"Q. I want to get straight on the word. Now, what is the usually accepted treatment in Pediatrics, for, we will say, a child who shows symptoms of discomfort, which, when you arrive there, you diagnose and say, 'I think this child has an attack of the grippe, or 'flu,' or something of that kind. What is the usual treatment in such cases as that? A. That was outlined very well this morning by—absolute rest in bed, drinking fluids and treating any symptoms as they arise, giving comfort and inhalations and the use of other remedies that are not to be considered here.

"Q. And in your opinion, would the use of this compound here tend to mitigate the conditions that are present in those cases? A. I believe it would.

"Q. Or any similar compound or drug? A. Yes, sir.

"Q. Have you ever seen it used when you get to a patient, when you are called; have you ever found this product having been used in cases of 'flu'? A. Very frequently.

"Q. What do you find the condition to be when you get there? That is, how were they using it? A. Usually heavily rubbing on the chest, I think usually the external use is more prevalent than the internal use of it. That has been my experience; that they rub the preparation on the chest or else put a little on a flannel and put it on the upper part of the chest, and put it around the throat and other places.

"Q. If they have used this preparation internally, of course a certain amount of camphor has been absorbed into the patient's system? A. A small amount.

"Q. What effect does camphor have on a child's condition; what is the effect of the drug itself; does it stimulate? A. It is a stimulant. The word as used this morning is a carminative, and relieves intestinal conditions.

"What about thyme oil present in the origanum oil; is that indicated as a therapeutic agent in some cases? A. Thyme oil is an antiseptic. It is rather soothing if taken internally and inhaling it relieves the congestion of the mucous membrane on account of its soothing effects.

"Q. Now, the Canada balsam, we will call it turpentine for short; has that a certain well-recognized therapeutic value in cases of that kind? A. Yes, that comes under

the term of turpentine. There are two classes of that, and that is recognized, and it is the basis of a good many remedies."

Dr. Schroeder of New York City, who prior to this case had never heard of this remedy, has had a large and extended practice for many years in the treatment of children's diseases and occupies a prominent place in the medical profession. After learning of the ingredients and the proportions, he testified that it "is a very good remedy. * * * There is not a substance in it which is not used in medicine or which is not recognized, and you not only find it in the American Pharmacopoeia, but find most of them in the French and Italian and German. The Canada balsam or turpentine has long been recognized as being distinctly helpful in all respiratory infections. * * + A great many cough expectorants have Canada balsam in them and it is distinctly useful as an expectorant. So far as camphor is concerned, everybody knows it is valuable. It depends chiefly on this fact, that it is volatile, and everything that can diminish the choking up of the nose so that you breathe more easily, makes you feel better and when you feel better you cure your disease faster." Regarding the therapeutic effect of this remedy, the doctor testified as follows:

"Q. Of course this compound here in and of itself is not a cure for anything, there is no such claim; but I want to know from you whether it has the ingredients in it which will have some curative effect and some therapeutic effect on the condition that you describe as the inflammation of the larynx? A. There is not a single solitary thing in that mixture that does not serve a useful purpose, so far as I can judge from its make-up, and everything in there seems to have been worked out with a nicety. Since I have learned how long this stuff has been used, that is quite amazing to me. I think it is an unusually nice preparation; and I am particularly pleased to see lard used as a base, because most people use petrolatum, which is the basis of Vick's, and lard is the best emollient we have. You have gone all over various substances which have in them thyme; and of course so far as whooping cough is concerned, I do not believe anybody in New York City at least has not used or uses mixtures for whooping cough diatussin pertussin, and both of these are extracts from thyme or oil of origanum; so nobody claims that thyme is a specific for whooping cough; but so far as anybody can judge, it will serve a very useful purpose, and I have been absolutely amazed at some cases that were very much helped."

Dr. Mullins, another expert, confirms the views expressed by Drs. Shaw and Schroeder, and testified that he has used this product in his own family and on his own children for fourteen years, and that in his opinion its use "shortens the course of some of the respiratory diseases," and that it "might shorten the course even of pneumonia by using the per cent. of thyme oil, being a respiratory antiseptic; by its carminative action and the sterling effect of the camphor."

In addition to all this, a number of nurses testified to its use over a period of years with successful results.

■ I see no merit in the attack on the trade-name. There is nothing misleading about it. The title is "Lee's Save the Baby." Its use is not limited to babies. Reading the labels and circulars and directions, it is clear that the remedy is equally beneficial for adults as for children or babies. The descriptive matter says so. Its use is recommended for any person young or old who may be afflicted with any of the diseases of the respiratory tract. The picture on the label and the carton offend no federal statute. While it is true that the mere fact of trade-mark does not take the product out of the operation of the act, nevertheless, when it appears that the product does not in any way violate any of the provisions of the statute, the rights of the owners of the trade-mark must have consideration and they may not be deprived of their property rights in order to meet some untenable position taken by some one in authority to whom is delegated the power to invoke the aid of the statute.

In conclusion, we revert to the allegations of the libel. They charge that there is a misbranding, in that this article "contains no ingredient or combination of ingredients capable of producing the effects claimed, and that the same were applied to the said article knowingly and in reckless and wanton disregard of their truth or falsity, so as to represent falsely and fraudulently to the purchasers thereof, and create in the minds of the purchasers thereof, the impression and belief, that the article was, in whole or in part, composed of, or contained, ingredients or medicinal agents effective in the diseases and conditions named therein."

The government has failed to prove that the allegations of its libel are true. On the other hand, the evidence abundantly shows that every ingredient in this mixture has some

therapeutic or curative value in connection with the treatment or mitigation of the ailments and diseases in which the use of this remedy is indicated or recommended on the label and in the circular contained within the package. Nor is there proof that the package or circular contains any statement, design, or device regarding the curative or therapeutic effect either of the compound itself or any ingredient therein contained which is false or fraudulent. As the name is distinctive and not descriptive, it does not offend the statute.

While not exactly in point, the opinion written by Judge Denison, speaking for the Circuit Court of Appeals of the Sixth Circuit in Raladam Co. v. Federal Trade Commission (decided June 28, 1930) 42 F.(2d) 430, is interesting and bears out in a general way the argument herein advanced and the conclusions reached.

The libel is dismissed, and the seized goods are ordered returned.

Submit decree accordingly.